STATE OF NEBRASKA v. EZRA M. BUSWELL.

FILED APRIL 17, 1894. NO. 6495.

1. **Physicians and Surgeons:** PRACTICE IN VIOLATION OF STATUTE: CHRISTIAN SCIENCE. The act to establish a state board of health, to regulate the practice of medicine in Nebraska, etc., is as much directed against any unauthorized person who shall operate on, profess to heal, or prescribe for or otherwise treat any physical or mental ailment of another, as against one who practices "medicine, surgery, and obstetrics," as those terms are usually and generally understood.

2. **The object of the statute** establishing a state board of health, etc., is to prevent imposition upon the afflicted by ignorant and unqualified pretenders to healing power; and any person not within the exceptions prescribed in said act, and not having complied with its requirements as to a certificate, who shall under any pretense operate on, profess to heal, or prescribe for or otherwise treat any physical or mental ailment of another, thereby renders himself liable to its penalties.

EXCEPTIONS by the county attorney to the decision of the district court for Gage county, BUSH, J., presiding.

Filed under the provisions of section 515 of the Criminal Code. *Exceptions sustained.*

*George H. Hastings, Attorney General,* and *R. W. Sabin, County Attorney,* for the state.

*Rickards & Prout* and *Alfred Hazlett, contra.*

RYAN, C.

The material parts of the indictment upon which the defendant was tried were in the following language:

"That Ezra M. Buswell, late of the county aforesaid, on the first day of September, in the year of our Lord one thousand eight hundred and ninety-one, in the county of Gage, and state of Nebraska aforesaid, then and there an illiterate man and unskilled in the art and faculty of medicine and surgery, and devising and intending by divers unlawful means falsely, unlawfully, craftily, and wickedly to deceive and defraud the people and citizens of said county of their goods, chattels, and money, to maintain his dishonest course of living, on the first day of September, in the year of our Lord one thousand eight hundred and ninety-one, and thence continually until the finding of this indictment, to-wit, for the space of eighteen months, at divers places in said county, falsely and unlawfully did assume upon himself to execute, exercise, and occupy the art, faculty, and science of a physician and surgeon, and did then and there profess to heal and otherwise treat sick persons of their physical and mental ailments, and did then and there falsely and fraudulently as a physician and pretended healer of sick persons attend on sick persons and persons with various infirmities, diseases, and wounds, and treat them and profess to heal them in the city of Beatrice and divers other places in said county,—the said Ezra M. Buswell never having been a graduate from any medical college; nor had he a diploma from any medical college,

as required by law, to practice medicine in said state, nor had he a certificate from the state board of health of said state entitling him to practice medicine or surgery or otherwise treat or profess to heal physical or mental ailments, nor had he complied with the law in any respect so as to entitle him to practice medicine or surgery or treat in any manner physical or mental ailments, nor had he confined himself to administering gratuitous services in case of emergency or to the administering of ordinary household remedies."

The defendant was acquitted and the case is brought to this court under the provisions of sections 483, 515, 516, 517 of the Criminal Code. To a compliance on our part with the provisions of the sections just referred to it is necessary only to consider the sixth instruction given at the request of the defendant. This instruction was in the following language:

"6. The jury are instructed, as a matter of law, that it is manifest from the law under which defendant is indicted that the object of the legislature in the enactment thereof was only to provide for the regulation of the practice of 'medicine, surgery, and obstetrics,' as these terms are generally understood; and unless you believe from the evidence, and beyond a reasonable doubt, that the defendant within the time mentioned in the indictment practiced 'medicine, surgery, and obstetrics,' as these terms are usually and generally understood, then you will find the defendant not guilty."

The law to which reference was made in the instruction is found in chapter 35 of the Laws of 1891. The act constituting chapter 35 aforesaid was entitled "An act to establish a state board of health, to regulate the practice of medicine in the state of Nebraska," etc. Section 17 thereof was as follows:

"Sec. 17. Any person shall be regarded as practicing medicine within the meaning of this act who shall operate

on, profess to heal, or prescribe for or otherwise treat any physical or mental ailment of another; but nothing in this act shall be construed to prohibit gratuitous services in case of emergency, and this act shall not apply to commissioned surgeons in the United States army and navy, nor to nurses in their legitimate occupations, nor to the administration of ordinary household remedies."

The other provisions of the act are, for our purpose, sufficiently indicated in the language already quoted from the indictment. The instruction complained of required, as an indispensable prerequisite to a conviction, that the jury should find that the defendant within the time mentioned in the indictment had practiced "medicine, surgery, or obstetrics," as those terms are usually and generally understood. Governed by this instruction, the jury could not do otherwise than acquit, for there was no proof to meet its requirement. Whether or not the instruction was proper in view of the evidence adduced, is the sole question presented for our determination.

It is conceded that the perfect toleration of religious sentiment and the enjoyment of liberty in all religious matters is of paramount importance, and lest the contention of the defendant may be misunderstood or imperfectly stated in our own language, that contained in the brief filed on behalf of the defendant will be freely used. Such evidence as was in that brief deemed sufficient to illustrate the argument for defendant, was as follows:

Richard Walthers testified that his brother's boy came home from Florida in September, 1892; that there were running sores on his legs caused by rheumatism, and that he could not walk except by the aid of crutches; that after the defendant had seen him, about two weeks after the boy came back, he laid aside his crutches and walked by the aid of a cane, and after using that for awhile, threw it away and walked as other boys do.

James Ellerbeck testified to having been bitten by a

rattlesnake, and that he at once sought the defendant and asked him for help. After talking with the defendant at the church rooms, they went to Rev. Buswell's house, and what took place there is best told in the language of the witness himself:

Q. What did you do then?

A. The pain ceased after his treatment, and after driving to his house it seemed to get worse until about 8 o'clock. He talked to me on the Bible and different subjects in the Bible, and about 8 o'clock he said he would treat me again. I laid down on a lounge and he sat down and put his hands over his face and was in that position may be ten or fifteen minutes; and all at once I felt it come right through me and it raised me up, and I sat on the lounge and I told him I had wakened up; and from that time on I had no more pain, only there was one or two minutes when I first got up and put my feet on the floor that the stiffness seemed to be hard for a few minutes. Now, during all this time I never lost a meal nor an hour's sleep after that one treatment.

L. Bushnell testified that he was afflicted with a disease that baffled the skill of the physicians, who advised him if he could obtain assistance from scientists that he should try; that he then sought aid from them and a very short time afterwards was able to go about as usual and sawed wood for the people of the village in order to earn his livelihood; that about three years prior to the time of giving his testimony he had fallen down a flight of stairs and had received serious injuries; that the defendant was sent for and visited him, and that he recovered without any other aid than that of the prayers of the defendant.

The witness Burgess testified of his serious illness from pneumonia, and that the defendant called on him and explained the Scripture to him and prayed for him, and that in a short time he recovered.

Mrs. Gibbs testified that in the previous January her

little boy, four years of age, had an attack of scarlet fever; that the physicians pronounced his case hopeless; that the child was treated by the Scientists and fully recovered.

The defendant Buswell, having been sworn, testified that he was a Christian Scientist so far as he understood, and that he lived up to the teachings of Jesus Christ; that he first studied the Christian Science in his home at Beatrice, and was cured of physical ills through that study; after that he studied with Mary B. G. Eddy in her Metaphysical College in Boston, of which college he was afterward a graduate. The term "Christian," as he understood it, means "Christ-like;" the teachings of Jesus understood and followed; science, truth understood. He further testified that the Scripture teaches us that God is truth. "Truth," the witness said, "is that which is always the same; can never change; the one Supreme Being; the All Powerful; that which created all things that are; He who made all that was made, and made it good, as is said in His Word. The Scripture tells us to know the truth and it will make us free. We understand 'to be free' means to be free in the full sense, free from sickness as well as from sin; that if God can heal the sinner He can heal the sick, or else the sick are more hopelessly lost than the sinner." "The Christian Science Church," said the witness, "has a recognized code and text-books of theology; these text-books are the Bible, Science and Health. Reverend Mary B. G. Eddy, of Boston, is the author of the book called 'Science and Health.' It and the Bible are the recognized standard among Christian Scientists and adherents of that faith." The accused further testified that he had not practiced surgery or medicine or any of the branches thereof within the state of Nebraska within the eighteen months preceding the trial; that in a medical sense he had not within eighteen months treated any physical or mental ailment within that time, for, said he, "I understand, with God's laws and not mortal man's. We

can experience this only as we learn of the nothingness of mortal man and of the omnipotence of God. When persons request aid and come to us for advice and assistance we treat them as a mother treats her child that is frightened at some object it fears, by showing them that God is love; and understanding the all-presence of love, there is no room for fear. We treat it as a question of fear; that is, we seek to dispel the fear by showing them the presence of love. The Scripture tells us that perfect love casts out fear. If we can convince ourselves, and those that are suffering, that God is all-powerful and that God is supreme; if we can show them through the Bible that God is the power that reigns entirely, just so far as they understand that, so far will they experience love and harmony and respond—as we speak of it. So far as I understand them, I have taught and teach the doctrines of Christian Science. Prayer enters into our work. We are taught by the Scripture to pray always. We understand prayer to mean the earnest sincere desire of the heart, and that desire is that we may know the omnipotence of God and the nothingness of ourselves. Our authority for this treatment is the Scripture—Jesus' teachings. Jesus taught His disciples to go out in the world and heal the sick and cast out devils and raise the dead, and he further said (His last words before His ascension): 'Teach all nations, baptizing them in the name of the Father, Son, and Holy Ghost. Teach them, if you are my disciples, to observe all things whatsoever I have commanded you; and lo, I am with you alway, even unto the end of the world.' We believe and understand (so far as we obey Him) that the same power is for us to-day as well as eighteen hundred years ago." Continuing his evidence, this witness said: "I have been engaged in this work since I first began to read Science and Health in connection with the Bible, which was eight years ago. I was healed from physical ills through the Science and Health and the Scripture. I was not treated

by Christian Scientists." In the course of his testimony this question was asked the witness, and the following answer was elicited:

Q. What is your custom in allowing people and parents to call physicians—the custom of yourself and church?.

A. We believe that every one has a right to express their wish, and it is always understood that if they prefer some other treatment, or some other mode, or some one else to aid them, it is their privilege. We always do that. It is taught in our text-books. We never give any medicine; that is entirely contrary to the teaching of Christian Science. I treated Mr. Burgess about three years ago. I found him suffering a great deal. If I remember he was not able to sit up; was bolstered up in bed, I think. I treated him solemnly and talked with him of the teaching of the Scripture and read to him from them, and also from Science and Health, and sought to show him that there was a greater power than man, and that that power ruled in love, and in proportion as that power was understood we should realize (demonstrate) the presence of love. At the end of a week he was able to go to his stock yards. I have no way of knowing the number of persons I have treated within eighteen months by means of Christian Science. I may have treated a hundred, or more. Of these only two died.

Commenting upon the facts counsel for defendant make use of the language following: "To place upon this section [17, *supra*] the construction contended for by the state, and to hold that the practices of the defendant are a violation of the law, would be to abrogate section 4, article 1, of the constitution of this state, which provides that all persons have the natural and indefeasible right to worship Almighty God according to the dictates of their own conscience; and also the second provision of section 4 of the enabling act, which provides that perfect toleration of religious sentiment shall be secured, and no inhabitant of said

state shall ever be molested in person or property on account of his or her mode of religious worship. The defendant, and those of the same faith with him, believe as a matter of conscience that the giving of medicine is a sin; that it is placing faith in the power of material things, which belongs alone to Omnipotence. To the Christian Scientist it is as much a violation of the law of God to take drugs for the alleviation of suffering or the cure of disease, as for a Methodist clergyman to take the name of his God in vain to relieve his over-wrought feelings. It is as much the duty of the defendant, as his conscience and understanding teach him his duty, to visit the sick and afflicted and relieve their distress of mind, as it is for the Presbyterian minister to go into his pulpit on Sabbath morning and preach the Word of God according to the understanding of that denomination, or visit the bedside of one of his sick parishioners and administer that religious consolation which is so dear to the heart of the Christian and which is apparently so necessary to their spiritual welfare. The act of the latter the eyes of all Christendom look upon in admiration as the performance of a Christian duty. Upon the former the able counsel for the state would have the world look as upon the act of a criminal." The defendant relied upon the teachings of the Bible as his authority as a Christian Scientist. It will not, therefore, be amiss to refer to it for instances applicable to his case. In the eighth chapter of the Acts of the Apostles we find an account of Simon, a sorcerer, who had used sorcery and bewitched the people of Samaria, giving out that himself was some great one. This Simon was thought to be the possessor of great power. Under the ministrations of Philip he believed and was baptized. Thereafter, sufficiently for our purpose, there follows a statement of the conduct of this convert, beginning with the eighteenth, and ending with the twenty-third, verse of the chapter just cited. These verses are as follows:

"18. And when Simon saw that through laying on of the apostles' hands the Holy Ghost was given, he offered them money,

"19. Saying, Give me also this power, that on whomsoever I lay hands, he may receive the Holy Ghost.

"20. But Peter said unto him, Thy money perish with thee, because thou hast thought that the gift of God may be purchased with money.

"21. Thou hast neither part nor lot in this matter; for thy heart is not right in the sight of God.

"22. Repent therefore of this thy wickedness, and pray God, if perhaps the thought of thine heart may be forgiven thee.

"23. For I perceive that thou art in the gall of bitterness, and in the bond of iniquity."

It would seem from this account that Simon regarded the gift of the Holy Ghost by the laying on of hands as something akin to, and an improvement upon, the sorcery which he himself had practiced, and, therefore, that its advantages were proper subjects of barter. The language of Peter, "Thy money perish with thee, because thou hast thought that the gift of God may be purchased with money," was a most emphatic and authoritative refutation of the idea that this special gift of God could form a proper basis for money transactions. The universal reprobation in which the conduct of Simon has ever been held has crystallized in the Latin word "*Simonia*," the English "Simony," etc., the derivative in each instance signifying either the crime of buying or selling ecclesiastical preferment or the corrupt presentation of any one to an ecclesiastical benefice for money or reward. In the case at bar the defendant testified as follows:

Q. You may state whether or not you make any charges when people come to you for advice or when you go to them.

A. As a rule I do not. We tell them we leave the ques-

tion to them and God. I spend my whole time at work showing to the people through examination and administration what the teachings of the Scripture are; and Jesus says, the laborer is worthy of his meat (?), and we expect that those who we spend our time for to remunerate us for it. If they are not willing to part with the sacrifice themselves, it is not expected that those should reap the benefit." This language puts the matter of compensation in a milder form than that adopted by Simon in the case above cited, but that even this modified claim is open to serious objection we think still further illustrated by an instance to which reference will now be made. In the fifth chapter of the second book of Kings there is an account of the healing of Naaman of leprosy, by compliance with a very simple hydropathic course of treatment prescribed by the prophet Elisha. After he was healed Naaman said to Elisha, "I pray thee take a blessing of thy servant," but Elisha said, "As the Lord liveth, before whom I stand, I will receive none. And he urged him to take it; but he refused." The subsequent proceedings are best given in the language found in verses 20 to 27, inclusive:

"20. But Gehazi, the servant of Elisha the man of God, said, Behold, my master has spared Naaman this Syrian, in not receiving at his hands that which he brought: but, as the Lord liveth, I will run after him, and take somewhat of him.

"21. So Gehazi followed after Naaman. And when Naaman saw him running after him, he lighted down from the chariot to meet him, and said, Is all well?

"22. And he said, All is well. My master hath sent me, saying, Behold, even now there be come to me from mount Ephraim two young men of the sons of the prophets: give them, I pray thee, a talent of silver, and two changes of garments.

"23. And Naaman said, Be content, take two talents. And he urged him, and bound two talents of silver in two

bags, with two changes of garments, and laid them upon
two of his servants; and they bare them before him.

" 24. And when he came to the tower, he took them
from their hand, and bestowed them in the house: and he
let the men go, and they departed.

"25. But he went in, and stood before his master. And
Elisha said unto him, Whence comest thou, Gehazi? And
he said, Thy servant went no whither.

" 26. And he said unto him, Went not mine heart with
thee, when the man turned again from his chariot to meet
thee? Is it a time to receive money, and to receive gar-
ments, and oliveyards, and vineyards, and sheep, and
oxen, and menservants, and maidservants?

" 27. The leprosy therefore of Naaman shall cleave unto
thee, and thy seed forever. And he went out from his
presence a leper as white as snow."

In chapters 22 *et seq.* of Numbers is recorded God's dis-
approval of Baalam's partly-executed project of profiting
by the use of the Divine power with which he was
endowed.

In the light of these instances, cited from defendant's
own authority, it is confidently believed that the exer-
cise of the art of healing for compensation, whether ex-
acted as a fee or expected as a gratuity, cannot be classed
as an act of worship. Neither is it the performance of a
religious duty, as was claimed in the district court. There
is no claim in this case that compensation in one or the other
of these methods was not accepted when tendered. The
evidence affirmatively shows the contrary. Not only is this
true, but we find a very considerable part of defendant's
brief devoted to an argument as to the inefficiency of the
established and recognized modes of treatment in the cure
of diseases as compared with defendant's method, as tested
by the results attained. The evidence upon which the case
was tried convinces us that the defendant was engaged in
treating physical ailments of others for compensation. He

was within none of the exceptions provided by statute.
The instruction which required that, to a conviction, he
should be found guilty of practicing medicine, surgery,
or obstetrics, as generally or usually understood, was erro-
neous. The object of the statute is to protect the afflicted
from the pretensions of the ignorant and avaricious, and
its provisions are not limited to those who attempt to fol-
low beaten paths and established usages. The conserv-
atism resulting from the study of standard authors might
be somewhat depended on to minimize the evils attendant
upon unlicensed practitioners' attempts to follow regular
and approved methods, although as against even these the
law should be enforced. Still more stringently should its
provisions be rendered effective against pretensions based
upon ignorance on the one hand and credulity on the other.
The statute does not merely give a new definition to lan-
guage having already a given and fixed meaning. It rather
creates a new class of offenses in clear and unambiguous
language, which should be interpreted and enforced accord-
ing to its terms.

Under the indictment, the sole question presented upon
the evidence was whether or not the defendant within the
time charged had operated on, or professed to heal, or pre-
scribed for or otherwise treat any physical or mental ail-
ment of another. There was involved no question of sen-
timent nor of religious practice or duty. If the defendant
was guilty as charged, neither pretense of worship nor of
the performance of any other duty should have exonerated
him from the punishment which an infraction of the stat-
ute involved. In cases presented as in this case, no judg-
ment can be rendered in this court, and, therefore, none
will be attempted. The exceptions of the county attorney
are sustained.

EXCEPTIONS SUSTAINED.