KANSAS CITY, Respondent, v. AMANDA J. BAIRD, Appellant.

Kansas City Court of Appeals, February 10, 1902.

1. **Medicine and Surgery:** PHYSICIANS: MEDICINE: DEFINITION: STATUTE: CLAIRVOYANTS: BONE-SETTERS. Medicine, in its ordinary sense as applied to human ailments, means something administered inwardly or externally in the treatment of disease though it need not necessarily be of such character as to be seen and handled; and a physician is one whose profession is to prescribe and administer such medicine and the statute may include "medical clairvoyants" and bone-setters using friction and fomentation.

Kansas City v. Baird.

2. ———: ———: DEFINITION: STATUTORY CONSTRUCTION. The statute regards as practicing medicine any one who professes publicly to be a physician and to prescribe for the sick or who appends M. D. to his name.

3. ———: ———: CHRISTIAN SCIENCE. A Christian Scientist, believing that disease is an illusion of the mind and not a reality and teaching the sick this theory of disease, is not a physician within the statute.

4. ———: ———: ———: KANSAS CITY ORDINANCE. Such Christian Scientist is not liable under the Kansas City ordinance requiring all physicians to report contagious diseases to the board of health.

5. ———: DIPHTHERIA: CHRISTIAN SCIENCE: KANSAS CITY ORDINANCE: EVIDENCE. The evidence as to whether a certain child had diphtheria is reviewed and held to be unsatisfactory and insufficient to show that defendant, a Christian Scientist who attended the child, knew that it was afflicted with diphtheria; whereas, the ordinance requires the city to show. the defendant is a physician and knew. the disease afflicting the patient was one mentioned therein.

Appeal from Jackson Criminal Court.—*Hon. Jno. W. Wofford*, Judge.

REVERSED AND DEFENDANT DISCHARGED.

*Witten & Hughes* and *H. C. McDougal* for appellant.

(1) There is no proof (a) that appellant was a "physician," nor (b) that she did "prescribe for or treat" the child, nor (c) that she had "knowledge" that the patient had diphtheria. Hence, her demurrer to the evidence should have been sustained. (2) The appellant was not a physician. R. S. 1899, sec. 8515; Bouv. Law Dict., tit. Physician; Wheeler v. Sawyer (Me.), 15 Atl. Rep. 67; Smith v. Lane (N. Y.), 24 Hun. 632; State v. Mylod (R. I.), 40 Atl. Rep. 753.

*Frank Gordon* for respondent.

(1)   The appellant, Amanda J. Baird, is a physician.   R. S. 1899, sec. 8515; 2 Rapalje and Lawrence's Law Dictionary, p. 961, tit. Physician; Wharton's Law Dictionary, p. 511, tit. Physician; Davidson v. Bohlman, 37 Mo. App. 576; Hewitt v. Cherrier, 16 Pick. 353; Bibber v. Simpson, 59 Me. 191; Nelson v. Harrington, 72 Wis. 591; State v. Buswell, 40 Neb. 158.   (2)   Where the trial court is intrusted with both the law and the facts, its findings are conclusive on the appellate court, if sustained by any substantial evidence.   Rice v. McClure, 74 Mo. App. 383; Rogers v. Warren, 75 Mo. App. 271; Gaines v. Fender, 82 Mo. 497; Miller v. Breneke, 83 Mo. 165; Swayze v. Bride, 34 Mo. App. 414; Vanhooser v. Berghoff, 90 Mo. 487; Carpenter v. Blake, 10 Hun. 358; Burnham v. Jackson, 1 Colo. App. 237; Boldt v. Murray, 2 N. Y. S. R. 232.   (3)   The decision was based upon the law and the fact. State v. Buswell, 40 Neb. 158.

ELLISON, J.—The defendant was charged with the violation of an ordinance of Kansas City reading as follows:

"Section 95.   Every physician who shall prescribe for or treat any case of scarlet fever, measles, diphtheria, smallpox, or any disease of a pestilent or epidemic nature, shall immediately, on receiving knowledge that the person or persons are afflicted with any of the said diseases, report the same to the board of health, and any physician who shall fail, neglect or refuse to so report to the board of health the existence of any case as provided in the section, shall be deemed guilty of a misdemeanor, and upon conviction thereof before the city recorder, shall be fined in a sum not less than ten nor more than fifty dollars."

She was convicted in the city court and thereupon appealed to the criminal court of Jackson county where she was again convicted.   She now comes here asking that the conviction be set aside and that she be discharged.

The ordinance is aimed at physicians, and it is apparent

that unless defendant was shown to be a physician she is not amenable to the ordinance; and whether she was a physician under the statute of this State, in force when the offense is charged to have been committed, is one of the principal issues in the case.

The testimony showed that she was what is known as a "Christian Scientist." That she attended upon a girl ten years old who, it is charged, was sick with diphtheria, being requested so to do by the child's mother, who was also a Christian Scientist; and that she received pay for other like attendance in the same family and was to receive pay for the attendance in controversy. It was conceded that she did not report the disease to the board of health.

The nature of the service rendered was described by the mother as that "The defendant demonstrated the principles of Christian Science; she imparted to the child the understanding of the truths of Christian Science audibly and mentally. Christian Scientists put out the thought of disease in their own minds. She imparted the truths of the science; impressed upon the child the understanding of Christian Science, there is no disease, the unreality of disease, and the allness of God. She read to the child from the Christian Science textbooks; just talked to her of the unreality of diseases and the allness of God. She talked of these truths and explained them. I called the defendant to attend the child as I would a teacher to instruct her in the spiritual understanding and the truth. In Christian Science we put all thoughts of disease in our consciousness. The child was conscious; if she had been unconscious defendant would have demonstrated in her own thoughts these truths. There is no disease. The child was under an illusion of disease and the object is to remove the illusion. If the child was only a month old, it would be reached through the parents. The defendant is a demonstrator of the principles of Christian Science. If the person dies it is a lack of demonstration. If the person gets well, it is the

demonstrating principle; the illusion has been removed. When the illusion is dispelled they become well."

In the following questions and answers the witness disclosed the breadth of her belief:

"Q. Suppose that this child had an arm broken, would it, in your idea, be an illusion and the arm not broken? A. Yes, sir, it would. Q. It wouldn't be broken? A. It might be to the sense of person, but in reality it wouldn't. Q. Supposing that it be cut off, would that be an illusion? A. Yes, sir. Q. There is no illusion about this child being dead? A. Yes, sir."

There is no doubt whatever that defendant was not a physician. The statute itself upon which the city relies to sustain the conviction, demonstrates this. The statute is under the significant heading of "Medicine and Surgery," and in the body thereof it refers to and contemplates "persons practicing medicine and surgery." R. S. 1899, secs. 8507, 8517. It regulates the practice of medicine and surgery by requiring persons who engage in practice to have diplomas and to obtain certificates from the board of health. The words "medicine and surgery" and "practicing medicine and surgery," being in a penal statute, must be taken to have a meaning in their ordinary sense. Medicine, in its ordinary sense, as applied to human ailments, means something which is administered, either internally or externally, in the treatment of disease, or the relief of sickness. It may be applied externally and it need not necessarily be a substance which may be seen and handled. It may consist of electricity conveyed by instruments or the human hand. And he whose profession it is to prescribe and administer this, after diagnosing the complaint, is a physician as commonly and ordinarily understood. Thus the statute will include what is known as "a medical clairvoyant" who visits sick patients, examines their condition, determines the nature of the disease and prescribes the remedies deemed most appropriate. Bibber v. Simpson, 59 Maine 181; Wilson v.

Harrington, 72 Wis. 591. And so one is practicing surgery who professes and practices bone-setting in dislocations and . fractures, reducing sprains, swellings and contraction of the sinews by friction and fomentation. Hewitt v. Charier, 16 Pick. 353.

But the lawmaking power does frequently step in and give to words, terms, or phrases, a broader meaning than they would have without such aid. The city claims that it has done so here, in that, at another place in the same article (sec. 8515), it describes those who shall be "regarded as practicing medicine." It reads: "Any person shall be regarded as practicing medicine within the meaning of this article, who shall profess, publicly, to be a physician, and to prescribe for the sick, or who shall append to his name the letters M. D.; but nothing in this article shall be construed to prohibit students from prescribing under the supervision of a preceptor, or to prohibit gratuitous services in cases of emergency; and this article shall not apply to commissioned surgeons of the United States army, navy and marine hospital service."

This section does not bear out the city's contention. It does not pretend to enlarge the ordinary meaning understood by the use of the word "physician." The entire article lays down qualifications and makes regulations for all those "practicing medicine and surgery." And by the section just quoted it declares that all those shall be regarded as practicing medicine who shall publicly profess to be a physician and prescribe for the sick; that is to say, a physician practicing and *prescribing medicine* for the sick. In a broad sense there may be "a physician for the soul," but surely the statute does not include those prescribing moral doctrine for the morally infirm. The statute evidently does not intend, by that section, to make any one a practitioner of medicine who is not such practitioner, or who does not pretend to be such. Its only object is to prevent the escape of those actually practicing medicine

(whether skilled physicians or fraudulent pretenders) by declaring they shall be considered as so doing if they publicly announce or "profess" that they are physicians, or append "M. D." to their names.

The full force and scope of the entire article discloses this. It evidently was not intended to cover a case like that of defendant. If it was, she, and all those doing like acts, would have been liable during the past twenty years it has been in force, to the severe pains and penalties prescribed by the statute for its violation in failing to be examined by the state board of health and receiving from said board a certificate entitling them to practice medicine and surgery in this State, and filing the same with the county clerk. Yet in all this time, we know of no instance in this State, in which a prosecution of such a person has been instituted under this statute. Though in Rhode Island, where there is a statute embracing the same purpose that ours does and which is very similar thereto, a person professing the belief the defendant is said to profess, and doing the acts which she is said to have done, was prosecuted under that statute, and there, as here, it was attempted to bring the party within the meaning of the statute which was leveled at those who practiced medicine or surgery. But the Supreme Court of that State, in July, 1898, in a well-considered opinion, not yet reported, gave the construction to that statute which we have herein given to ours. State v. Mylod, 40 Atl. Rep. 753.

In England there is a statute providing severe punishment for any parent who, being able, shall willfully neglect to provide medical aid for his sick child of tender years. A child, two years old, was for a long time sick with "chronic inflammation of the lungs and pleura," and finally died without the father having called in a physician. He belonged to a sect known as "Peculiar People" and was prosecuted. At the trial it was shown that "During the whole period of the child's illness he did not procure any skilled advice as to the treatment

of the child, but left it in the charge of women who belonged to his sect, and called in at intervals George Hurvey, an engine driver, who prayed over the child and anointed it with oil. The reason of this course of conduct was explained by Hurvey, who was called as a witness. He stated that the Peculiar People never called in medical advice or gave medicines in case of sickness. They had religious objections to doing so. They called in the elders of the church, who prayed over the sick person, anointing him with oil in the name of the Lord. This he said they did in literal compliance with the directions in the fourteenth and fifteenth verses of the fifth chapter of the Epistle of St. James, and in hope that the cure would follow. This course was pursued with regard to the deceased infant during its illness." The father was found guilty and the conviction sustained on appeal. The Queen v. Downes, 1 Q. B. D. .25.

It will be observed that the charge in that case was that a physician was not called to attend the child, but it never occurred to the defendant, the attorneys in the case, or to the distinguished judge who decided it, that in calling in the man Hurvey, the father *had* called a physician and was therefore not guilty of a violation of the statute. So if there had been an ordinance in Kansas City like the English statute aforesaid, and the mother of the deceased child had been prosecuted for failing to call a physician, we apprehend that the prosecuting authority would have been slow to concede, and the courts equally slow to allow, that proof of the calling of defendant would have been a defense.

The city has cited us to and relies much on the case of State v. Buswell, 40 Neb. 158. The case does not in any way support the prosecution. It is based on a statute wholly different from ours, as will be seen by the following: "Sec. 17. Any person shall be regarded as practicing medicine within the meaning of this act who shall operate on, profess to heal, or prescribe for or otherwise treat any physical or mental ail-

ment of another." By comparing that section with section 8515, of our statute above set out, it will be seen that they are without similarity.

Since the date of the charge against defendant, there has been enacted in this State a statute (Laws 1901, p. 207) repealing that which we have construed and, manifestly, it was enacted for the reason that the Legislature considered the former statute as not applicable to a case made up of facts like those of defendant's. It is now provided in section one of said last act: "It shall be unlawful for any person not now a registered physician within the meaning of the law, to practice medicine or surgery in any of its departments, or to profess to cure and attempt to treat the sick and others afflicted with bodily or mental infirmities, or engage in the practice of midwifery in the State of Missouri, except as hereinafter provided." By comparing this section with section 8515, the radical change will be discovered.

There was another issue in the case equally vital. By the ordinance aforesaid the defendant was required to report diphtheria to the board of health only upon her knowing it was diphtheria. No law could require her to report a case as diphtheria unless she knew it was that disease. Now there is no evidence whatever to show that she knew the child was afflicted with diphtheria. Indeed evidence that the child had diphtheria at all is very lame, inconclusive and unsatisfactory. Her mother testified that she was sick about ten days. That she did not complain of any special trouble. She complained "at times a little. Complained of feeling badly all over; occasionally her throat; that is all. She didn't complain of any local suffering except in her throat." The deputy coroner called in after the child's death, when asked the cause of the death, testified as follows:

"Q. You were called to make an autopsy, to find out the cause of death? A. Yes, sir. Q. Did you do that? A. Yes, sir. Q. What was the cause of death? A. I

obtained from the child's throat a quantity of mucous membrane, ulcers of the throat, at that time unknown to me what it was; I brought some to the board of health. Q. Did you make an examination to determine the cause of death? A. Yes, sir. Q. Did you determine? A. No, sir. Q. What did you find? A. I found ulcers in the child's throat. Q. What did you do? A. I removed some of the membrane. Q. What did you find then? A. I didn't make the microscopic examination. Q. Who made that? A. Doctor McVey. Q. Did you finally determine the cause of death? A. Yes, sir. Q. What was it? A. Diphtheria."

Another physician testified to the general fact that diphtheria made the throat sore and sometimes caused ulcers in the throat, and that it was contagious. But he also said the throat became sore and ulcerated from other troubles. He said nothing about the case of this child, or that he had ever seen her, or that he had ever heard of her death. It is on such evidence as this that the city has asked that defendant be found guilty of knowing that the child had diphtheria. If we are to form any conclusion from the meager testimony of the deputy coroner, he himself did not know what the disease was. He says that he did not make the microscopic examination, but that Dr. McVey did and that he (the witness) then finally determined the cause of the death to be diphtheria. It was probably meant by this statement that he found what the disease was from Dr. McVey's examination. Singularly enough, the city did not call McVey, and thus we are left without any very definite evidence that the child was ever afflicted with diphtheria, much less that defendant knew that she was.

The object and purpose of the ordinance was that contagious diseases might be hindered from spreading and preventive means adopted by the board of health. To that end the ordinance required all physicians called to attend any such diseases to report them to the board. The object of the stat-

ute was not to require that one afflicted with such disease shall have a physician, but simply when one is called in he shall report the disease to the board as soon as he becomes aware of its nature. Neither was it the object of the ordinance to punish any one for practicing medicine, or for pretending to heal the sick by any other means, or through any other process. The ordinance is simply a necessary police regulation, under the terms of which it is, among other things, necessary to prove that a *physician* attended the sick person and that he *knew* the case was one of those diseases mentioned in the ordinance.

In this case there was an utter failure in both these requisites, and the judgment will therefore be reversed and defendant discharged. The other judges concur.