## CITY MAGISTRATES' COURT—CITY OF NEW YORK.
### FIRST DIVISION—SECOND DISTRICT,
#### Feb. 18, 1911.

## THE PEOPLE v. WILLIS VERNON COLE.

(N. Y. Law Jour., Feb. 18, 1911.)

(1.) PUBLIC HEALTH LAW, SEC 160—ILLEGAL PRACTICE OF MEDICINE— CHRISTIAN SCIENCE HEALERS.

Administering Christian Science treatment for bodily ailment, with pecuniary compensation, is not covered by constitutional guaranty of religious freedom.

*Almuth C. Vandiver* for complainant; *William Travers Jerome* for defendant.

FRESCHI, C. M.—This is an application for a warrant made by the complainant, the New York County Medical Society, through its learned counsel, upon a summons issued by me in pursuance of the provisions of the " Inferior Criminal Courts Act of the City of New York " (Laws 1910, chap. 659, sec. 82).

The information presented and filed charges the defendant, Willis Vernon Cole, with the practicing of medicine without being duly qualified and licensed, as defined in section 160 of the Public Health Law of the State of New York. This section provides:

* * * " 7. The practice of medicine is defined as follows: A person practices medicine within the meaning of this article, except as hereinafter stated, who holds himself out as being able to diagnose, treat, operate or prescribe for any human disease, pain, injury, deformity, or physical condition,

and who shall either offer or undertake, by any means or method, to diagnose, treat, operate or prescribe for any human disease, pain, injury, deformity or physical condition."

The exception in the Health Law is stated in section 173 of the same law as follows:

" This article shall not be construed to affect  *  *  * the practice of the religious tenets of any church."

It is alleged in the information and the testimony establishes that the defendant did hold himself out to and did actually treat Mrs. Isabella Goodwin, a police matron, and Mrs. Frances Benzecry and the latter's infant daughter Lucille, for the ailments and diseases from which they claimed they suffered. His treatment consisted substantially in sitting opposite each patient for several minutes in mental prayer and in reading to Mrs. Benzecry certain passages from a book of Mary Baker G. Eddy entitled " Science and Health." The defendant admits that the treatment given by him was the recital of prayers, and asserts that in this treatment he was practicing the religious tenets of the Church of Christ, Scientists, of which he was a believer and known as a " healer " or " practitioner." From his testimony it appears that his authority to " treat " was derived from the publication of an advertisement in the *Christian Science Journal,* a publication of this church. This advertisement was paid for at advertising rates, and the application to insert the " card " or advertisement was passed upon by the " publication committee " of this church, which made, it is claimed, a personal investigation as to defendant's life and his moral fitness, and only after it received three signed statements of persons who had been cured by him. In the language of the witness, Virgil O. Strickler, first reader of the Christian Science Church, " the publishers of the *Christian Science Journal* publish the cards of practitioners in the *Journal* whom the publishers of the *Journal* have investigated and consider worthy to have their names printed in the *Journal.* There are many

other Christian Science practitioners whose names are not included in the *Journal*, but those included in the *Journal* are those who have been investigated by the proper officials of the organization, and, in a sense, they are looked upon as being better practitioners." Furthermore, the defendant testified that he practiced before the publication of this advertisement.

"Practitioner" Cole maintained his offices in an office building at No. 225 Fifth avenue, New York City, and there the patrons or clients who visited him were treated for their alleged physical ills and to alleviate suffering by methods known as Christian Science treatment, and this for pay, the charges therefor being fixed, for each visit. Mrs. Goodwin narrates in detail her visit to the defendant's place of business on January 7, 1911, and states that upon entering his private office the defendant inquired, "What is the matter with you?" and that she replied that she was suffering from palpitation of the heart and bladder trouble, and whereupon "he told me to sit down in a chair." The defendant then seated himself opposite her, a few feet away, and held his hand to his face for about fifteen minutes. Complainant further testified that Mr. Cole said to her, "I think you will be benefited at once: you seem to be responding to treatment," and she paid his charge of $2 when the defendant told her to call again. She admits that the defendant did not perform any operation, nor did he make any examination or give any prescription. Mrs. Benzecry testified that on her first visit to the defendant's office she inquired if he was a doctor and that he said he was a Christian Science healer, and when he inquired what was the trouble she said that she suffered in the eyes, and Mr. Cole said "I must keep my glasses off." The defendant told her in the course of the visit that he could cure locomotor ataxia by prayer. She asked him about a pain in her back, and he made reply that it is a disease, but couldn't tell what kind of sickness it was. She discussed the system of treatment generally and paid defendant

his fee charged for the treatment on the occasion of each of several visits.

The learned counsel for the defendant has waived the question as to whether or not these facts constitute "treatment" within the meaning of the "practice of medicine" as the same is defined in the statute, and relies entirely upon the following language of section 173 of the law, which reads: "This article shall not be construed to affect * * * the practice of the religious tenets of any church."

When the constitution of 1894 was adopted, section 3, Article I of the preceding constitution of 1846, without change, was continued in full force, providing as follows: "The free exercise and enjoyment of religious profession and worship, without discrimination or preference, shall forever be allowed in this State to all mankind; and no person shall be rendered incompetent to be a witness on account of his opinions on matters of religious belief, *but the liberty of conscience hereby secured shall not be so construed as to excuse acts of licentiousness or justify practices inconsistent with the peace or safety of this State."* (N. Y. Const., Art. I, sec. 3).

Thus the establishment of freedom of worship and religious liberty was guaranteed.

I must hold that the defendant was given no greater liberties by the exception provided in the Public Health Law than he enjoyed under the State and Federal Constitutions. It is undisputed that religious liberty and the freedom of worship were among the defendant's inalienable rights even before the enactment of that statute law. The establishment and the teaching of the religion in which the defendant is an ardent believer contravened no law. Prohibiting the free exercise thereof would clearly be unconstitutional, but the freedom of religion cannot be extended to prevent the punishment of crime (Davis v. Beacon, 133 N. S. 333). Story in his work on the Constitution (5th ed.) says at section 1879 that the whole power over

the subject of religion is left exclusively to the State governments, to be acted upon according to their own sense of justice. The organic basic law of our State must therefore govern. The Public Health Law (supra) does not infringe upon the constitution. It regulates the practice of medicine, and thereby the State protects the health of its citizens, as it has a right to do so, acting, as it must, according to its own sense of justice (Dent v. West Virginia, 129 U. S. 114; People v. Mulford, 125 N. Y. Supp., App. Div., 680; s. c., 140 App. Div., 716). The defendant now invokes his constitutional prerogative of freedom of worship and religious liberty. He pleads exemption from the operation of the Public Health Law under the circumstances of this case in that he claims to be engaged in the observance of certain religious tenets of the Christian Science Church.

I am of the opinion that the practice of the treatment of sickness and disease by inaudible prayer as established by the evidence in this case violates the law of this State. The only theory on which the defendant can claim any right to practice as a " healer " of diseases and sickness is that the reservation stated in the Public Health Law of this State to the effect that the " article shall not be construed to affect   *   *   *   the practice of religious tenets of any church," excludes him from the operation of the definition of the " practice of medicine." It is, of course, true that the State Constitution grants to every person freedom of conscience in matters of religion; but, on the other hand, it specifically provides that " *the liberty of conscience hereby secured shall not be construed as to excuse acts of licentiousness or justify practices inconsistent with the peace or safety of this State.*" A composite definition of the words used in the clause of the Public Health Law under consideration affecting the practice and observance of religious tenets may be stated as the act, influence or purpose of carrying out the regular pursuit of some profession concerned with religion

in the matter of opinion, principle, dogma or doctrine which a person, school or sect holds or maintains as true. Thus it is to be seen that the right of freedom of religious belief and worship is purely personal and individual (not the subject of governmental review) and that no one shall be affected in the exercise of his belief and faith in the Divine Being so long as the beliefs of the church and the exercise thereof do not jeopardize others and non-believers. The field of personal opinion is inviolable. The church and the State must be independent. The inviolability of the freedom of religious profession and worship must, however, in no wise impair or menace the safety of the State or the security of its people in their health.

The public health and the treatment of disease are matters of great concern to all States and the subject of proper public regulation in the exercise of their police powers. In the matter of the First Church of Christ Scientist (6 Pa. Dist. Rep., 745) an application was made for a charter of a proposed corporation " to preach the Gospel according to the doctrines of Christ, as found in the Bible and stated in the tenets of Christian Science." One of the tenets stated is: " We acknowledge the way of salvation demonstrated by Jesus to be the power of truth over all error, sin, *sickness and death,* and the resurrection of human faith and understanding to seize the great possibilities and living energies of divine life." One of the rules of these tenets prescribed: " To become a member of the First Church of Christ Scientist in Philadelphia, Pa., the applicant must be a believer in the doctrines of Christian Science, according to the teaching contained in the book ' Science and Health ' * * * The Bible and the above named book, with other books by the same author, must be his only text books for self-instruction in Christian Science and for practicing metaphysical healing." Presiding Judge Pennypacker, subsequently Governor of the Commonwealth of Pennsylvania, in refusing the charter, wrote (p. 746). " If the purpose of the

proposed corporation were only to inculcate a creed or to promulgate a form of worship no question could arise, because under the Constitution of Pennsylvania private belief is beyond public control, and there can be no interference with the right of conscience.    But the most cursory examination of the * * * testimony and of the tenets, and of the book of Mrs. Eddy, which is placed upon a level with the Bible in the teachings of this church, shows that there is a Christian faith and a science, not only a belief but a purpose to accomplish practical results; not only an attempt to educate the community to the importance of the recognition of certain ethical principles, but an effort to establish a prescribed method of practicing the art of healing the diseases of the body.    * * *    The treatment extends to the most serious and fatal diseases—rheumatism, scorfula, cancer, small-pox and consumption." The court in that case quotes from page 422 of Mrs. Eddy's book, viz: " If the case to be mentally treated is consumption, take up the leading points included according to belief in that disease. Show that it is not inherited, that inflammation, tubercles, hemorrhage and decomposition are beliefs.    * * *    Then these ills will disappear.    If the lungs are disappearing, this is but one of the beliefs of mortal mind."    No knowledge, it seems, was required of anatomy, physiology, pathology or hygiene; the whole system was based on the theory that all disease, even those of a contagious character, were mere beliefs and not real facts.    On appeal the Supreme Court of Pennsylvania reviewed the whole case and held that such a system is opposed to the general policy of the law of that State relative to the existence and treatment of disease (sec. 205, Pa. St. Rep. 543).    Mr. Justice Potter, for the Appellate Court, writing in the case on page 550 said: " We are not to consider the matter from either a theological or metaphysical standpoint, but only in its practical aspects.    It is not a question as to how far prayer for the recovery of the sick may be efficacious.    The

common faith of mankind relies not only upon prayer, but upon the use of means which knowledge and experience have shown to be efficient. And when the results of this knowledge and experience have been crystallized into legislative enactments, declarative of what the good of the community requires in the treatment of disease and of the qualifications of those who publicly deal with disease, anything in opposition thereto may fairly be taken as injurious to the community. Our laws recognize disease as a grim reality to be met and grappled with as such. To secure the safety and protect the health of the public from the acts of incompetent persons the law prescribes the qualifications of those who shall be allowed to attempt the cure or healing of disease. It is not for the purpose of compelling the use of any particular remedies or of any remedies at all. It is only designed to secure competent service for those who desire to obtain medical attendance. In certain diseases the individual affected may be the only one to suffer for lack of proper attention, but in other types of a contagious or infectious nature they may be such as to endanger the whole community, and here it is the policy of the law to assume control and require the use of the most effective known means to overcome and stamp out disease which otherwise would become epidemic. In such cases failure to treat or an attempt to treat by those not possessing the lawful qualifications is equally violative of the policy of the law. It may be said that the wisdom or the folly of depending upon the power of inaudible prayer alone, in the cure of disease, is for the parties who invoke such a remedy. But this is not wholly true, ' For none of us liveth to himself, and no man dieth to himself, and the consequence of leaving disease run unchecked in the community is so serious that sound public policy forbids it. Neither the law nor reason has any objection to the offering of prayer for the recovery of the sick. But in many cases both law and common sense require the use of other means which have been given

to us for the healing of sickness and the cure of disease. There is ample room for the office of prayer in seeking for the blessing of restored health even when we have faithfully and conscientiously used all the means known to the science and art of medicine."

In Nebraska and Ohio, where the State constitutional provisions are similar to those of the New York State Constitution providing for liberty of conscience and freedom of religious belief, the practice of the art of faith healing, as Christian Science is often known, has been held to be a violation of the law regulating the practice of medicine (State v. Buswell, 40 Neb. 158; State v. Marble, 72 Ohio, 21). In State v. Buswell (supra) the defendant, a Christian Scientist, was charged with practicing medicine without a license. He excused his acts on the ground that he treated the sick by prayer; that the constitution of that State contained this clause: "All men have a natural and indefeasible right to worship Almighty God according to the dictates of their own conscience (sec. 4, Art. I, Const. of Nebraska, 1875), and that to prohibit him to heal the sick by prayer would be also in violation of the Nebraska Enabling Act providing for perfect toleration of religious sentiment, and that no person should ever be molested in person or property on account of his or her mode of religious worship. Chancellor Ryan, writing for the court, at page 169, says: "In light of these instances, cited from defendant's own authority, it is confidently believed that the exercise of the art of healing for compensation, whether exacted as a fee or expected as a gratuity, cannot be classed as an act of worship. Neither is it the performance of a religious duty. * * * The evidence upon which the case was tried convinces us that the defendant was engaged in treating physical ailments of others for compensation. He was within none of the exceptions provided by statute." The Nebraska case seems to be conclusive upon the question at bar—whether or not the defendant had operated on,

or professed to heal, or prescribed for or otherwise treated any physical or mental ailment of another.

The Nebraska case was followed by the Ohio Supreme Court in State v. Marble (supra). There the defendant was prosecuted for unlawful practice of medicine. His plea in defense was substantially that prescribing for a fee Christian Science treatment for cure of bodily ailment is not practicing of medicine within the meaning of the statute; that Christian Science is a religious belief; and that he treated in obedience to a religious and conscientious duty. The court held that the practice of medicine is subject to such reasonable regulations or conditions as the State in the exercise of the police power may prescribe (France v. The State, 57 Ohio St. 1; The State of Ohio v. Gardner, 58 Ohio St. 599). The court in the Marble case, by Mr. Justice Summers, at page 31, wrote:

" But if the inhibition of the statute tends to the public welfare and is not obnoxious on other grounds it is not within the provision of the bill of rights. In Bloom v. Richards (2 Ohio St. 387, 392). Thurman, J., says: ' Acts evil in their nature or dangerous to the public welfare may be forbidden and punished, though sanctioned by one religion and prohibited by another; but this creates no preference whatever, for they would be equally forbidden and punished if all religions permitted them. Thus, no plea of his religion should shield a murderer, ravisher or bigamist, for community would be at the mercy of superstition if such crimes as these could be committed with impunity because sanctioned by some religious delusion.' " At page 23 the opinion continues and quotes as follows: " The power of the State to provide for the general welfare of its people authorizes it to prescribe all such regulations as in its judgment will secure or tend to secure them against the consequences of ignorance and incapacity as well as deception and fraud. As one of the means to this end it has been the practice of different States from time immemorial to exact in

many pursuits a certain degree of skill and learning upon which the community may confidently rely. * * * ' " Disposing of the defendant's contention that the statute interfered with the defendant's right to worship God alone according to the dictates of his conscience, the learned justice said (p. 36) : " But it is said the offering of prayer to God for the recovery of the sick is not against public health or public morals or public safety or public welfare. Admitted. But is that a correct statement of the case ? If the defendant prayed for the recovery of Hehl that was the treatment he gave him for the cure of his rheumatism and for which Hehl paid him. He was practicing healing or curing diseases. To assume that legislation may be directed only against administering of drugs or the use of the knife is to take a too narrow view. The subject of the legislation is not medicine and surgery. It is the public health or the practice of healing. The State might make it an offense, as has been done in New York (People v. Pierson, 176 N. Y. 201), for anyone to omit to furnish medical attendance to those dependent upon him, and at the same time leave him at liberty to die in any manner he may choose. But this is not all. While the State may not deem it wise to go to the extent of requiring the individual to avail himself of the services of a physician, yet it may not wish to hasten his death and so to transfer to itself the burden of supporting those dependent upon him by making it possible for him to employ an empiric. Again, where there is an infectious or contagious disease, the public welfare may be vitally affected by a failure promptly to recognize it, and so the State is interested in permitting to practicing the art of healing only those possessing recognized qualifications. So that regarding disease rather than the treatment of it as the subject of the legislation, it is not necessary that the statute be preventive of particular practices, but it may make the right to undertake the treatment of disease dependent upon the possession of reasonable qualifications."

In the case of People v. Pierson, cited with approval in the opinion of the learned Ohio court, the Court of Appeals of this State has decided that it was criminal to withhold "medical attendance" from a sick child and to treat the same solely according to the religious beliefs of the father of the child. In this case the defendant Pierson was indicted for manslaughter for neglecting to furnish medical attendance to his child. The court held that the medical attendance mentioned in the statute was the medical attendance of a regularly licensed practitioner. Discussing the contention as to the constitutionality of the provision of the Penal Code requiring a parent to provide "medical attendance," the learned court, in People v. Pierson (supra, at page 210), through Mr. Justice Haight, said: "The remaining question which we deem it necessary to consider is the claim that the provisions of the Code are violative of the provision of the Constitution (Article I, section 3), which provides that "the free exercise and worship, without discrimination or preference, shall forever be allowed in this State to all mankind, and no person shall be rendered incompetent to be a witness on account of his opinions on matters of religious belief; but the liberty of conscience hereby secured shall not be so construed as to excuse acts of licentiousness or justify practices inconsistent with the peace or safety of this State.' The peace and safety of the State involves the protection of the lives and health of its children, as well as the obedience to its laws. Full and free enjoyment of religious profession and worship is guaranteed, but acts which are not worship are not. A person cannot, under the guise of religious belief, practice polygamy and still be protected from our statutes constituting the crime of bigamy. * * * We are aware that there are people who believe that the divine power may be invoked to heal the sick, and that faith is all that is required. There are others who believe that the Creator has supplied the earth, nature's storehouse, with everything that man may want for

his support and maintenance, including the restoration and preservation of his health, and that he is left to work out his own salvation under fixed natural laws.  There are still others who believe that Christianity and science go hand in hand, both proceeding from the Creator; that science is. but the agent of the Almighty, through which He accomplishes results, and that both science and divine power may be invoked together to restore diseased and suffering humanity.  But, sitting as a court of law for the purpose of construing and determining the meaning of statutes, we have nothing to do with these variances in religious beliefs, and have no power to determine which is correct.  We place no limitation upon the power of the mind over the body, the power of faith to dispel disease, or the power of the Supreme Being to heal the sick.  We merely declare the law as given us by the Legislature."

In People v. Mylod (20 R. I. 632) the court held that the faith healing as taught by Christian Science is not a practice of medicine.  The defendant was the President and First Reader or Pastor of the Providence Church of Christ, Scientist. He had treated one witness for malaria and one for grip.  He testified, in his own behalf, that he did not attempt to cure the witnesses by any means or power of his own; that he assured them that it is God alone who heals, acting through the human mind, and that all he did was to engage in silent prayer for them.  The court cited the Nebraska case (supra), but did not follow it; on the contrary, quoted Smith v. Lane (24 Hun, 632) approvingly.  In the State of New York the cases of Smith v. Lane (supra) and State v. Mylod (supra) have been disapproved in the case of People v. Alcutt (117 App. Div. 546, aff'd in 189 N. Y. 517), it appearing from the reports that the district attorney asking for the affirmance of that case was William Travers Jerome, Esq., the learned counsel for the defendant here.

Mr. Justice Clarke, writing (p. 551) for the Appellate Division in the last mentioned case, said: " The appellant cites five cases in other States as in harmony with Smith v. Lane (supra). State v. Liffring (61 Ohio St. 39) was under the peculiar language of the statutory definition which was held to require the use of drugs in order to constitute the practice of medicine. There was subsequently an amendment of the Ohio statute, and the subsequent cases of State v. Gravett (65 Ohio St. 289) and State v. Marble (72 id., 21) were decided the other way. State v. Herring (70 N. Y. L. 34) was also decided upon the wording of the statute. Nelson v. State Board of Health (108 Ky. 769, 57 S. W. Rep. 501) and State v. McKnight (131 N. C. 717) are not entitled to be considered authorities in this jurisdiction, inasmuch as they proceed upon the proposition that in those States it would be unconstitutional for the Legislature to limit the right to practice medicine, a doctrine counter to that held in the rest of the Union. There remains but one case, that of State v. Mylod (20 R. I. 632), a case of a Christian Scientist. The court pointed out that the defendant not only did attempt to treat disease, but he denied its very existence. In contrast with this last case is People v. Pierson (176 N. Y. 201). Pierson believed in ' divine healing.' His child had catarrhal pneumonia and died. Pierson did not call in a physician, but believed the child could be cured by prayer * * * omitting to furnish ' medical attendance ' to the child. Judge Haight concludes that the medical attendance required by the provision of the Penal Code could be furnished only by a physician duly authorized to practice under the Public Health Law, and the conviction was sustained. As opposed to the cases following Smith v. Lane, the courts of Massachusetts, Maine, Michigan, Iowa, Missouri, Colorado, Nebraska, Illinois, Ohio, Alabama, Indiana, New Mexico, South Dakota and Tennessee refuse to restrict the

'practice of medicine' to the administration of drugs or the use of surgical instruments."

From a study of these cases I must rule that religion is beyond judicial interference so long as one keeps it to himself and does not jeopardize others; but the moment there is an invasion of the rights of the State by some overt act or conduct that tends to affect the safety and future welfare of its people, then the civil government may intervene for its own protection and preservation. The government may enact laws for the regulation and standardization of our conduct, and impose punishment for those acts which constitute a violation of such laws; but it must not interfere with opinions on the part of its people unless those people reflect them in acts that affect the social well-being of the State; then government may intervene for its own welfare. Religious belief is no excuse for an unlawful act. No person under the guise of the practice of the principles and tenets of any church may violate the law of the land (United States v. Reynolds, 98 U. S., 145; Dent v. West Virginia, supra). The Reynolds case (supra) seems to settle the law in this respect. There an indictment was found against Reynolds charging him with bigamy under the Revised Statutes of the Territory of Utah. Among his other assignments of error on review before the United States Supreme Court the defendant urged that he should be acquitted even if he did marry the second time, because he believed it to be his religious duty. Mr. Chief Justice Waite delivered the opinion of the court, and in discussing the defense of religious belief or duty, said at page 161: " On the trial the plaintiff in error, the accused, proved that at the time of his alleged second marriage he was, and for many years before had been, a member of the Church of Jesus Christ of Latter-Day Saints, commonly called the Mormon Church, and a believer in its doctrine; that it was an accepted doctrine of that church ' that it was the duty of male members of said church, circumstances permitting, to

practice polygamy; * * * that the practice of polygamy was directly enjoined upon the male members thereof by the Almighty God in a revelation to Joseph Smith, the founder and prophet of said church; that the failing or refusing to practice polygamy by such male members of said church, when circumstances would admit, would be punished, and that the penalty for such failure and refusal would be damnation in the life to come.' " After a lucid discussion on the meaning of " religion " and a review of the extent of religious freedom which has been guaranteed, the chief justice further said, at page 166: " Laws are made for the government of actions, and while they cannot interfere with mere religious belief and opinions they may with practices. Suppose one believed that human sacrifices were a necessary part of religious worship, would it be seriously contended that the civil government under which he lived could not interfere to prevent a sacrifice? Or if a wife religiously believed it was her duty to burn herself upon the funeral pile of her dead husband, would it be beyond the power of the civil government to prevent her carrying her belief into practice? So here, as a law of the organization of society under the exclusive dominion of the United States, it is provided that plural marriages shall not be allowed. Can a man excuse his practices to the contrary because of his religious belief? To permit this would be to make the professed doctrines of religious belief superior to the law of the land, and in effect to permit every citizen to become a law unto himself. Government could exist only in name under such circumstances. * * * The only defense of the accused in this case is his belief that the law ought not to have been enacted. It matters not that his belief was a part of his professed religion; it was still belief, and belief only."

John C. Calhoun, in his " Individual Liberty " speech delivered in 1848, said in part: " The safety and well-being of society are as paramount to individual liberty as the safety and

well-being of the race are to that of individuals; and, in the same proportion, the power necessary for the safety of society is paramount to individual liberty." The trend of these decisions seems to define clearly the line of demarcation between free religious worship and unlawful practice of medicine under the guise of a religion. A thorough and prolonged search of all decisions in point rendered in the courts of our States fails to reveal that religion or its practice has ever been construed to be a business (see also matter of Bandel v. Board of Health, 193 N. Y. 133). The Public Health Law, as its very title indicated, is a legislative expression and enactment for the preservation of the health and safety of the people in this State and unequivocally prescribes the qualifications of those who seek the privilege or franchise to practice medicine. Its violation is made a misdemeanor and is punishable by fine or imprisonment. The Christian Scientist has the right to believe that he can heal by prayer, but I am of the opinion that if he carries and puts that belief into practice for hire and solicits patients by advertisement, then he exceeds his rights as an individual under the law and comes directly within the prohibition contained in Article III of the Constitution of the State of New York. He must subordinate his beliefs to the rights of the community and of the State as an entity when the free exercise of such belief either impairs and endangers the health of the the people or tends to place their health in jeopardy so that safety of the State will be affected.

So far as this record is concerned, I may infer that the ailments of which the complainant's witness testified actually existed and were not feigned. Certainly the continuance of a practice or profession to heal as defendant claims can be done in this case ought to be the subject of judicial review of our higher and appellate courts. The duty of a magistrate is to inquire whether there exists probable cause to believe that a defendant is guilty of a crime and where the proof makes

out a case it is imperative upon a city magistrate to issue a warrant and hold the defendant to answer at the trial.

Let a warrant be issued on proper papers, including the transcript of the testimony adduced before me as part of the information on which this complaint is filed against the defendant, and that the defendant shall be dealt with according to law.