THE PEOPLE OF THE STATE OF NEW YORK, Appellant, *v.*
J. LUTHER PIERSON, Respondent.

1. MISDEMEANOR — UNLAWFUL OMISSION TO PROVIDE MEDICAL
ATTENDANCE FOR A MINOR CHILD — WHEN INDICTMENT THEREFOR
SUFFICIENT — WHEN OMISSION TO FURNISH MEDICAL ATTENDANCE IS
UNLAWFUL. An indictment under section 288 of the Penal Code, pro-
viding that "A person who, 1, willfully omits without lawful excuse,
to perform a duty by law imposed upon him to furnish food, clothing,
shelter or medical attendance to a minor  \* \* \*  or, 4, neglects, refuses
or omits to comply with any provisions of this section,  \* \* \*  is
guilty of a misdemeanor," which charges that the defendant willfully,
maliciously and unlawfully omitted, without lawful excuse, to perform
a duty imposed upon him by law, to furnish medical attendance for
his minor child, said minor being ill and suffering from catarrhal pneu-
monia, and that he willfully, maliciously and unlawfully neglected
and refused to allow said minor to be attended and provided for by a
regularly licensed and practicing physician, is not bad because it fails to
allege that the case was one in which a regularly licensed and practicing
physician should have been called, and, therefore, fails to charge a criminal
offense, since that is necessarily implied from the language used; if the
medical attendance was not necessary it was not a duty required of the
defendant to furnish it; if it was necessary then it was his duty to furnish
it and his failure to do so is an unlawful omission to perform a duty
imposed, and constitutes a misdemeanor.

2. TEST OF NECESSITY FOR MEDICAL ATTENDANCE — REASONABLE DIS-
CRETION. The necessary medical attendance required for the preserva-
tion of the health of the child does not contemplate the necessity of call-
ing a physician for every trifling complaint with which the child may be
afflicted, which in most instances may be overcome by the ordinary house-
hold nursing by members of the family; a reasonable amount of discretion
is vested in persons upon whom the duty is imposed, and the standard is,
at what time would an ordinarily prudent person, solicitous for the welfare
of the child and anxious to promote its recovery, deem it necessary to call
in the services of a physician.

3. DUTY TO FURNISH MEDICAL ATTENDANCE TO MINOR CHILD IMPOSED
BY STATUTE ON GUARDIANS, PARENTS AND THOSE IN LOCO PARENTIS.
The phrase "a duty by law imposed" has reference to persons designated
in the statutes and in the common law as parents, guardians or those who
by adoption or otherwise have assumed the relation *in loco parentis,* and
the character of the duties is specified in the section, and, therefore,
assuming that such persons were not bound at common law to furnish
medical attendance for minors, that duty is expressly provided for and is
made obligatory upon them by the statute.

4. MEANING OF "MEDICAL ATTENDANCE." The term "medical attendance" means attendance by a person who under the statute (L. 1880, ch. 513) is a regularly licensed physician, and does not include that by a layman who, because of his religious belief that prayer for Divine aid was the proper remedy for sickness, neglects to furnish proper medical attendance to a minor child who was dangerously ill.

5. CONSTITUTIONAL GUARANTY OF FREEDOM OF WORSHIP NOT VIOLATED BY STATUTORY REQUIREMENT. The constitutional guaranty of the full and free enjoyment of religious profession and worship (Const. art. 1, § 3) is not violated by the statute, since practices inconsistent with the peace and safety of the state are not justifiable, and the peace and safety of the state involves the protection of the lives and health of its children as well as obedience to its laws — the omission, therefore to afford this protection is a public wrong and properly punishable as such.

*People* v. *Pierson,* 80 App. Div. 415, reversed.

(Argued June 15, 1903; decided October 13, 1903.)

APPEAL from an order of the Appellate Division of the Supreme Court in the second judicial department, entered April 25, 1903, which reversed a judgment of the Westchester County Court entered upon a verdict convicting the defendant of a misdemeanor and granting a new trial.

The facts, so far as material, are stated in the opinion.

*J. Addison Young* for appellant. The indictment charges a crime and the appellate court erred in reversing the judgment of conviction on this ground. (Penal Code, § 288.) The defendant was under a duty imposed by statute to see to it that he did not cause or permit the life of his child to be endangered or its health to be impaired. (Penal Code, § 289; *Cowley* v. *People,* 83 N. Y. 464; *People* v. *McDonald,* 49 Hun, 67; *Regina* v. *Downes,* 13 Cox Cr. Cas. 111; *Queen* v. *Senior,* L. R. [1 Q. B. Div.] 283.)

*Robert E. Farley* for respondent. The statute under which the defendent was tried and convicted does not in terms or effect declare that it is the duty of any one to furnish medical attendance to a minor. (Penal Code, § 288.) The statute

being penal in its nature must be strictly construed in favor
of the accused. ( *V. C. C. Co.* v. *Murtagh,* 50 N. Y. 314 ;
*Sturgis* v. *Spofford,* 45 N. Y. 446, 453 ; *People* v. *Rosenberg,*
138 N. Y. 410, 415 ; *People* v. *Nelson,* 153 N. Y. 90, 94.)
The defendant having been guilty of no offense at common law,
his liability, if any, must be under the statute, and no statutory
offense can be established by implication. There must be a
clear and positive expression of the legislative intent to make a
given act or omission criminal. (*People* v. *Phyfe,* 136 N. Y.
554.) There is no common-law duty to furnish medical attend-
ance to a minor. (*Reg.* v. *Beers,* 32 Canada L. J. 416 ; *Reg.* v.
*Coventry,* 2 N. T. Rep. 245 ; *Reg.* v. *Wagstaffe,* 10 Cox C. C.
530 ; 1 Whart. Crim. Law [10th ed.], 352.) Medicine and medi-
cal attendance are not necessities under the law. (*Corsi* v.
*Maretzek,* 4 E. D. Smith, 1.) To compel a citizen to furnish
medical attendance for his infant child would be an invasion
of an inalienable right and a violation of the Constitution.
(*Powell* v. *Penn.,* 127 U. S. 678 ; 1 Tiedemann on Police
Powers, 4, 7–17 ; *Lawton* v. *Steele,* 119 N. Y. 226 ; *L. S.,*
etc., *R. R. Co.* v. *Smith,* 173 U. S. 689 ; *Allgeyer* v. *State of
Louisiana,* 165 U. S. 578 ; *Colon* v. *Lisk,* 153 N. Y. 188 ;
*People ex rel.* v. *Warden,* 157 N. Y. 129 ; *People ex rel.* v.
*Warden,* 144 N. Y. 535 ; *Matter of Jacobs,* 98 N. Y. 98 ;
*People* v. *Havnor,* 149 N. Y. 195 ; *People* v. *Turner,* 55
Ill. 280.) Unless the defendant had an evil intent he was not
guilty of the crime charged. (*Stokes* v. *People,* 53 N. Y.
179.) The indictment failed to charge a criminal offense.
( *Wood* v. *People,* 53 N. Y. 511 ; *People* v. *Dumar,* 106 N.
Y. 502 ; *Tully* v. *People,* 67 N. Y. 15 ; *People* v. *Allen,* 5
Den. 76 ; *People* v. *Albron,* 140 N. Y. 130.)

HAIGHT, J. The indictment accused the defendant of the
crime of violating section 288 of the Penal Code in that he
" did wilfully, maliciously, and unlawfully omit without law-
ful excuse, to perform a duty imposed upon him by law, to
furnish medical attendance for his said (J. Luther Pierson's)
female minor child, under the age of two years, the said minor

being then and there ill and suffering from catarrhal pneumonia, and he, the said J. Luther Pierson, then and there wilfully, maliciously, and unlawfully neglecting and refusing to allow said minor to be attended and prescribed for by a regularly licensed and practicing physician and surgeon, contrary to the form of the statute in such case made and provided."

The facts disclosed upon the trial are without substantial dispute, and are in substance as follows: The defendant and his wife lived at Valhalla near White Plains, New York, with an infant girl sixteen and a half months old, whom they had adopted. In January, 1901, the child contracted whooping cough which continued to afflict her until about the 20th day of February, at which time catarrhal pneumonia developed, resulting in death on the 23rd of February, 1901. The defendant testified that for about forty-eight hours before the child died he observed that her symptoms were of a dangerous character, and yet he did not send for or call a physician to treat her, although he was able financially to do so. His reason for not calling a physician was that he believed in Divine healing which could be accomplished by prayer. He stated that he belonged to the Christian Catholic church of Chicago, that he did not believe in physicians, and his religious faith led him to believe that the child would get well by prayer. He believed in disease, but believed that religion was a cure of disease.

In submitting the case to the jury the trial court charged, in substance, that before the jurors could convict the defendant they must find that he knew that the child was ill, and deliberately and intentionally failed or refused to call a physician, or to give the child such medicines as the science of the age would say would be proper that a child in its condition should have; that if at the time he refused to call a physician he knew the child to be dangerously ill, his belief constitutes no defense whatever to the charge made. In other words, no man can be permitted to set up his religious belief as a defense to the commission of an act which is in plain violation of the law of the state. The jury rendered a verdict of guilty

of the crime as charged. The Appellate Division has reversed, but, as we have seen, has examined the facts and found no error therein, but rests its reversal upon what it considers to be errors of law. The majority of the court appears to have entertained the view that the indictment failed to charge a criminal offense, for the reason that it did not contain an allegation that the case was one in which a regularly licensed and practicing physician ought to have been called.

Section 288 of the Penal Code, so far as is material upon the question under consideration, provides as follows : " A person who, 1. Wilfully omits, without lawful excuse, to perform a duty, by law imposed upon him, to furnish food, clothing, shelter, or medical attendance to a minor,  *  *  * or, 4. Neglects, refuses or omits to comply with any provisions of this section,  *  *  * is guilty of a misdemeanor."

It would seem that the legislative intent in adopting this provision of the Code is reasonably clear, although possibly more precise language could have been employed. It contemplates that there are persons upon whom the law casts a duty of caring for minors, but it does not specify the persons. They are, however, those upon whom the duty is "by law imposed." They are designated in the statutes and in the common law as the parents, guardians, or those who by adoption or otherwise have assumed the relation *in loco parentis*. The duty of such a person is specified by the provisions of the section. It is " to furnish food, clothing, shelter, or medical attendance." Giving the statute a reasonable construction by applying the rule of necessity, it is apparent that it means the necessary food, clothing, shelter or medical attendance required for the preservation of the health and life of the child. We quite agree that the Code does not contemplate the necessity of calling a physician for every trifling complaint with which the child may be afflicted which in most instances may be overcome by the ordinary household nursing by members of the family ; that a reasonable amount of discretion is vested in parents, charged with the duty of maintaining and bringing up infant children ; and that the

standard is at what time would an ordinarily prudent person, solicitous for the welfare of his child and anxious to promote its recovery, deem it necessary to call in the services of a physician. But is it necessary that all of this should be set forth in the indictment? The indictment has alleged that the defendant unlawfully omitted to perform a duty imposed upon him, to furnish medical attendance for the child. If the medical attendance was not necessary, it was not a duty required of the defendant to furnish it; but if it was necessary, then it was his duty to furnish it, and his failure to do so would be an unlawful omission to perform a duty imposed, as charged in the indictment. We, therefore, think that the criticism made upon the indictment cannot be sustained.

It is now contended that section 288 of the Penal Code does not in terms, or in effect, make it the duty of any one to furnish medical attendance to a minor child, and that under the common law it is not part of the duty of parents to provide medical attendance for their children. We have already considered, in part, the provisions of the section and have indicated our conclusion that the clause, "a duty by law imposed," as found in this section, had reference to the person upon whom the law imposed the duty of caring for minors, leaving it to the provisions of the section to particularize as to the character of those duties. In other words, that the section, properly construed, means that a person upon whom the law has imposed the duty to care for a minor, who willfully omits without lawful excuse to furnish such minor with necessary food, clothing, shelter or medical attendance, is guilty of a misdemeanor. Under this construction of the statute, the duty of parents to furnish medical attendance for their children is expressly provided for, and is made obligatory upon them, even if they were exempt from such duty under the common law. These views are in harmony with section 289 of the Penal Code, which provides that "A person who: 1. Willfully causes or permits the life or limb of any child actually or apparently under the age of sixteen years to be endangered, or its health to be injured, or its morals to become depraved,

* * * is guilty of a misdemeanor," and are also in accord with the view taken by this court in the case of *Cowley* v. *People* (83 N. Y. 464), in which the judgment of conviction was sustained, where the indictment charged the injury to the child's health by reason of a neglect to furnish and administer to it proper and sufficient medicine and furnish proper medical attendance, under the latter section of the Code.

We are thus brought to a consideration of what is meant by the term " medical attendance." Does it mean a regularly licensed physician, or may some other person render " medical attendance? " The foundation of medical science was laid by Hippocrates in Greece five hundred years before the Christian era. His discoveries, experiences and observations were further developed and taught in the schools of Alexandria and Salerno, and have come down to us through all the intervening centuries, yet medicine as a science made but little advance in northern Europe for many years thereafter; practically none until the dawn of the eighteenth century. After the adoption of Christianity by Rome and the conversion of the greater part of Europe, there commenced a growth of legends of miracles connected with the lives of great men who became benefactors of humanity. Some of these have been canonized by the church, and are to-day looked upon by a large portion of the Christian world as saints who had miraculous power. The great majority of miracles recorded had reference to the healing of the sick through Divine intervention, and so extensively was this belief rooted in the minds of the people that for a thousand years or more it was considered dishonorable to practice physic or surgery. At the Lateran Council of the church, held at the beginning of the thirteenth century, physicians were forbidden, under pain of expulsion from the church, to undertake medical treatment without calling in a priest; and as late as two hundred and fifty years thereafter Pope Pius V renewed the command of Pope Innocent by enforcing the penalties. The curing by miracles, or by interposition of Divine power, continued throughout Christian Europe during the entire period of the Middle Ages,

and was the mode of treating sickness recognized by the church. This power to heal was not confined to the Catholics alone, but was also in later years invoked by Protestants and by rulers. We are told that Henry VIII, Queen Elizabeth, the Stuarts, James I and Charles I, all possessed the power to cure epilepsy, scrofula and other diseases known as the king's evil; and there is incontrovertible evidence that Charles II, the most thorough debauchee who ever sat on the English throne, possessed this miraculous gift in a marked degree, and that for the purpose of effecting cures he touched nearly a hundred thousand persons.

With the commencement of the eighteenth century a number of important discoveries were made in medicine and surgery which effected a great change in public sentiment, and these have been followed by numerous discoveries of specifics in drugs and compounds. These discoveries have resulted in the establishment of schools for experiments and colleges throughout the civilized world for the special education of those who have chosen the practice of medicine for their profession. These schools and colleges have gone a long way in establishing medicine as a science, and such it has come to be recognized in the law of our land. By the middle of the eighteenth century the custom of calling upon practitioners of medicine in case of serious illness had become quite general in England, France and Germany, and, indeed, to a considerable extent throughout Europe and in this country. From that time on the practice among the people of engaging physicians has continued to increase until it has come to be regarded as a duty, devolving upon persons having the care of others, to call upon medical assistance in case of serious illness. Schouler, in his work on Domestic Relations, at page 318, speaking upon the subject of parental duty in the maintenance of children, says : " It is a plain precept of universal law that young and tender beings should be nurtured and brought up by their parents; and this precept have all nations enforced." And again, at page 548, speaking upon the subject of what constitutes necessary maintenance, he

says : " Food, lodging, clothes, *medical attendance,* and educa-
tion, to use concise words, constitute the five leading elements
in the doctrine of the infant's necessaries." In England the
first statute upon the subject to which our attention has been
called, was that of 31 and 32 Vict., chapter 122, section 37,
which made it the duty of persons having the care of infants
to provide them with "medical aid." This statute was
amended in 1894 by 57 and 58 Vict., chapter 41, so as to read
substantially the same as section 289 of our Penal Code, to
which we have referred. Our own statute upon the subject
was adopted as part of the Penal Code, chapter 676 of the
Laws of 1881, containing the section under which the defendant
is indicted.

Formerly, no license or certificate was required of a person
who undertook the practice of medicine. A certificate or
diploma of an incorporated medical college was looked upon
by the public as furnishing the necessary qualification for a
person to engage in the practice of such profession. The
result was that many persons engaged in the practice of medi-
cine who had acquired no scientific knowledge with reference
to the character of diseases or of the ingredients of drugs that
they administered, some of whom imposed upon the public by
purchasing diplomas from fraudulent concerns and advertising
them as real. This resulted in the adoption of several statutes
upon the subject. The first statute to which we call attention
is chapter 513 of the Laws of 1880, in which every person,
before commencing to practice physic and surgery, is required
to procure himself to be registered in the office of the clerk of the
county where he intends to practice, giving the authority under
which he claims the right to engage in the profession, either by
diploma or license, and making a violation of the provisions of
the act a misdemeanor. Although this statute was an amend-
ment of chapter 746 of the Laws of 1872, it is the first statute
that we have found which prohibits the practice of medicine by
any other than a person possessing a diploma from a medical col-
lege conferring upon him the degree of doctor of medicine, or
a certificate from the constituted authorities giving him the

14

right to practice. This was followed by the Laws of 1887, chapter 647, entitled, " An act to regulate the licensing and registration of physicians and to codify the medical laws of the state of New York," which has been further amended and carried into the Public Health Law of 1893, sections 140–153 inclusive, in which there is an absolute prohibition to practice physics unless the person be a regularly licensed physician in accordance with the provisions of the act.

It will be observed that the provision of the Penal Code under consideration was first adopted in 1881 following the statute of 1880 prohibiting the practice of medicine by other than physicians duly qualified in accordance with the provisions of the act. This, we think, is significant. The legislature first limits the right to practice medicine to those who have been licensed and registered or have received a diploma from some incorporated college conferring upon them the degree of doctor of medicine, and then the following year it enacts the provision of the Penal Code under consideration, in which it requires the procurement of medical attendance under the circumstances to which we have called attention. We think, therefore, that the medical attendance required by the Code is the authorized medical attendance prescribed by the statute, and this view is strengthened from the fact that the third subdivision of this section of the Code requires nurses to report certain conditions of infants under two weeks of age " to a legally qualified practitioner of medicine of the city, town or place where such child is being cared for," thus particularly specifying the kind of practitioner recognized by the statute as a medical attendant.

The remaining question which we deem it necessary to consider is the claim that the provisions of the Code are violative of the provisions of the Constitution, article 1, section 3, which provides that " The free exercise and enjoyment of religious profession and worship, without discrimination or preference, shall forever be allowed in this state to all mankind; and no person shall be rendered incompetent to be a witness on account of his opinions on matters of religious

belief; but the liberty of conscience hereby secured shall not be so construed as to excuse acts of licentiousness, or justify practices inconsistent with the peace or safety of this state." The peace and safety of the state involves the protection of the lives and health of its children as well as the obedience to its laws. Full and free enjoyment of religious profession and worship is guaranteed, but acts which are not worship are not. A person cannot, under the guise of religious belief, practice polygamy and still be protected from our statutes constituting the crime of bigamy. He cannot, under the belief or profession of belief that he should be relieved from the care of children, be excused from punishment for slaying those who have been born to him. Children when born into the world are utterly helpless, having neither the power to care for, protect or maintain themselves. They are exposed to all the ills to which flesh is heir, and require careful nursing, and at times, when danger is present, the help of an experienced physician. But the law of nature, as well as the common law, devolves upon the parents the duty of caring for their young in sickness and in health, and of doing whatever may be necessary for their care, maintenance and preservation, including medical attendance if necessary, and an omission to do this is a public wrong which the state, under its police powers, may prevent. The legislature is the sovereign power of the state. It may enact laws for the maintenance of order by prescribing a punishment for those who transgress. While it has no power to deprive persons of life, liberty or property without due process of law, it may, in case of the commission of acts which are public wrongs or which are destructive of private rights, specify that for which the punishment shall be death, imprisonment or the forfeiture of property. (*Barker* v. *People*, 3 Cow. 686–704; *Lawton* v. *Steele*, 119 N. Y. 226–236; *Thurlow* v. *Commonwealth of Mass.*, 5 How. [U. S.] 504–583.)

We are aware that there are people who believe that the Divine power may be invoked to heal the sick, and that faith is all that is required. There are others who believe that the

Creator has supplied the earth, nature's storehouse, with everything that man may want for his support and maintenance, including the restoration and preservtion of his health, and that he is left to work out his own salvation, under fixed natural laws.  There are still others who believe that Christianity and science go hand in hand, both proceeding from the Creator; that science is but the agent of the Almighty through which he accomplishes results, and that both science and Divine power may be invoked together to restore diseased and suffering humanity.  But, sitting as a court of law for the purpose of construing and determining the meaning of statutes, we have nothing to do with these variances in religious beliefs and have no power to determine which-is correct.  We place no limitations upon the power of the mind over the body, the power of faith to dispel disease, or the power of the Supreme Being to heal the sick. We merely declare the law as given us by the legislature.  We have considered the legal proposition raised by the record, and have found no error on the part of the trial court that called for a reversal.  The other questions in the case involve questions of fact which are not brought up for review, and consequently are not before us for consideration.

The order of the Appellate Division reversing the judgment of conviction should be reversed, and the judgment of conviction of the trial court affirmed.

CULLEN, J.  I concur in the opinion of Judge HAIGHT The State as *parens patriæ* is authorized to legislate for the protection of children.  As to an adult (except possibly in the case of a contagious disease which would affect the health of others) I think there is no power to prescribe what medical treatment he shall receive, and that he is entitled to follow his own election, whether that election be dictated by religious belief or other considerations.

PARKER, Ch. J., BARTLETT, VANN, CULLEN and WERNER, JJ., concur; MARTIN, J., not voting.

Order reversed, etc.