Summers, J.
The right to practice medicine has been so long and so universally subject to state regulation that it might almost be said to be not an absolute right but a privilege or franchise. Assuming, however, that it is an absolute right, it is conceded that it is subject to such reasonable regulations or conditions as the state in the exercise of the police power may prescribe. France v. The State, 57 Ohio St., 1; The State of Ohio v. Gardner, 58 Ohio St., 599.
*25 The contention of counsel for the defendant is, first, that prescribing, for a fee, Christian Science treatment for the cure of a bodily ailment is not practicing medicine within the meaning of the statute; second, that Christian Science is a religious belief and that defendant in giving the treatment, did so in obedience to a religious and conscientious duty or, in other words, was worshiping God according to the dictates of his conscience, and that a statute interfering therewith is unconstitutional as depriving him of his natural and indefeasible right to worship Almighty God according to the dictates of his own conscience; third, that if Christian Science is a school of medicine the act discriminates against Christian Science in that it has made provision for the examination of the practitioners of other schools of medicine that are related to other theories of medicine but that it has made no such provision for the Christian Science practitioner, but on the contrary requires him to take the same examination that is prescribed for the so-called regular physician.
It is not necessary to notice the various statutes regulating the practice of medicine that have been passed in this state. The first was passed in 1811 and numerous acts have since been passed down to the act of 1902 involved in the present controversy. Eeference is made to them in the briefs of counsel in State of Ohio v. Gravett, 65 Ohio St., 289. It is sufficient for present purposes to say that in 1896 a comprehensive act, entitled “An act to regulate the practice of medicine in the state of Ohio,” was passed. It provided a state board of medical registration and examination and that no person should practice medicine, surgery or mid *26 wifery, in any of its branches in this state without first complying with the requirements of- the act. Its requirements were to the effect that a person engaged in the practice must obtain a certificate from the board upon a showing either that he was a graduate in medicine or surgery, or a legal practitioner under the laws then in force, or upon such examination before the board as to his qualifications as the board might require, and as to a person practicing midwifery, that she should obtain a certificate from the probate judge of the county in which she resides.
So much of the section defining who shall be regarded as a practitioner of medicine and surgery within the meaning of the act, as is necessary to an understanding of the question determined, is here set out, and as subsequently amended, the changes being indicated by the words in italics.
“Any person shall be regarded as practicing medicine or surgery within the meaning of this act who shall append the letters M. D. or M. B. to his name, or for a fee prescribe, direct or recommend for the use of any person, any drug or medicine or other agency for the treatment, cure or relief of any wound, fracture or bodily injury, infirmity or disease; provided, however, that nothing in this act shall be construed to prohibit service in case of emergency, or the domestic administration of family remedies.” (February 27, 1896, 92 O. L., 47.)
“Sec. 4403f. Any person shall be regarded as practicing medicine or surgery or midivifery within the meaning of this act, who shall use the words or letters ‘Dr.,’ ‘Doctor,’ ‘Professor,’ ‘M. D.,’ ‘M. B.,’ or any other title, in connection with- his name, which in any way represents him as engaged in the practice *27 of medicine or surgery or midwifery, in any of its branches, or, who shall prescribe, or who shall recommend for a fee for like use any drug or medicine, appliance, application, operation or treatment, of whatever nature, for the cure or relief of any wound, fracture or bodily injury, infirmity or disease. The use of any of the above mentioned words or letters, or titles in such connection, and under such circumstances as to induce the belief that the person whú uses them is engaged in the practice of medicine or surgery or midwifery in any of its branches, shall be deemed and accepted as prima facie proof of an intent on the part• of such person to represent himself as engaged in the practice of medicine or surgery or midwifery, provided, however, that nothing in this act shall be construed to prohibit service in the ease of emergency, or the domestic administration of family remedies.” (April 14,1900, 94 O. L., 200.)
The section as amended April 21, 1902 (95 O. L., 212), is not changed in the particular part under consideration.
In the State of Ohio v. Liffring, 61 Ohio St., 39, it was held that osteopathy was not an “agency” within the meaning of the act of 1896 and in the State of Ohio v. Gravett, supra, it was held that it was within the meaning of the statute as amended in 1900.
In the opinion in the latter case, Shauck, J., referring to the former case, says: (306, 307)
“The view then urged by the attorney general was that the system of rubbing or kneading the body, known as osteopathy, is an ‘agency’ within the meaning of the statute; hut the interpretation of the statute seemed to invoke the maxim noscitur a sociis as an aid in determining the meaning of the word, *28 and onr conclusion was that it meant something of like character with a drug or medicine to be administered with a view to producing effects by virtue of its own potency; and that it, therefore, did not include osteopathy. * * *
“It seems quite clear that in its present form the statute affords no proper occasion for the application of the maxim of interpretation by which we were aided in State v. Liffring, supra. Careful comparison of the two acts with respect to their definitions of the practice regulated shows that while in the former the legislature intended to prohibit the administration of drugs by persons not informed as to their effect or potency, by the latter it has attempted a comprehensive regulation of the practice of the healing art; so far, at least, as to require the preparatory education of those who, for compensation, practice it according to any of its theories. The comprehensive language of the statute and the purpose which it clearly indicates require the conclusion that osteopathy is within the practice now regulated.”
The conceded facts are that the defendant did not recommend or prescribe for the cure or relief of Christ Hehl any drug, medicine, appliance, application or operation, but on the contrary that he made no diagnosis or any physical examination, gave him no directions as to food, diet, exercise or any other directions, nor did he make any inquiry as to the nature of the disease with which he was afflicted. The only thing he did was to offer prayer for his recovery. He was called to see Hehl for rheumatism, but called on him but once, and after that gave him what is among the followers of Christian Science *29 known as absent treatment for one week, and at the end of that time Hehl paid him $5.00 for his services. The defendant did not have a certificate from the state board of medical registration and examination as required by the statute.
It is contended that the word “treatment” is to be given its meaning as used in the practice of medicine and that as so read it means the application of remedies to the curing of disease, that a remedy is a medicine or application or process; that process is an action or operation and that prayer for the recovery of the sick is neither.'
Technically this may be correct, but the science of medicine has made some advance since the time Macbeth wished to throw physic to the dogs because his doctor could not cure a mind diseased, but told him “Therein the patient must minister to himself.”
Now days doctors cure imaginary diseases by means that would as easily as Christian Science escape the above definition.
What Christian Science is we do not know. The practice of it is referred to as treatment by its followers. Mrs. Mary Baker G. Eddy in “Science and. Health,” page 410, says:
“Always begin your treatment by allaying the fear of patients. Silently reassure the patient as to his exemption from disease and danger. Watch the result of his simple rule of Christian Science, and you will find that it alleviates the symptoms of every disease. If you succeed in wholly removing the fear your patient is healed. The great fact that God wisely governs all, never punishing aught but sin, is your standpoint whence to advance and destroy the human fear of sickness. Plead the case in Science *30 and for Truth, mentally and silently. You may vary the arguments, to meet the peculiar or general symptoms of the case you treat; but be thoroughly persuaded- in your own mind, and you will finally be the winner.
“You may call the disease by name when you address it mentally; but by naming it audibly, you are liable to impress it upon the thought. The silence of Christian Science-and Love is eloquent. It is powerful to unclasp the hold of disease, and reduce its cause to nothingness.
“To prevent disease or to cure it mentally, let Spirit destroy this dream of sense. If you wish to heal by argument, find the type of the ailment, get its name, and array your mental plea against the-physical. Argue with the patient (mentally, not audibly) that he has no disease, and conform the argument to the evidence. Mentally insist that health is the everlasting fact and sickness the temporal falsity. Then realize the presence of health, and the corporeal senses will respond. £ So be it! ’ ”
If its followers call it treatment they ought not to .be heard to say it is not. Dr. O. W. Holmes, Med. Ess., says: “Disease is to be treated by anything that is proved to cure it.”
The statute' of 1896, as we have seen, -had been held by this court not to comprise the practice of osteopathy and by a lower court (Evans v. The State, 9 Dec., 222; 6 N. P., 129) not to apply to Christian Science. So that the use of the words “of whatever nature” in the amendment are quite significant and we have no doubt the legislative intent was to bring within this definition every person who for a fee prescribes or recommends a cure for disease, even *31 though the cure is to come not from himself but, through his intercedence, from God. In Illinois the legislature when it enacted “any person shall be regarded as practicing medicine, within the meaning of this act, who shall treat or profess to treat, operate on or prescribe for any physical ailment or any physical.-injury or deformity of another” thought it necessary to exclude Christian Science by providing that nothing in this section shall be construed to apply to any person who ministers' to or treats the sick or suffering by mental or spiritual means, without the use of any drug or material remedy.
The next contention is that the statute interferes with defendant’s right to worship God according to the dictates of his conscience. No specific provision of the constitution is referred to. Section 7 of our bill of rights provides “All men have a natural and indefeasible right to worship Almighty God according to the dictates of their own conscience * * * nor shall any interference with the rights of conscience be permitted.”
It is to be observed that the statute does not prohibit the prescribing or recommending the treatment except for a fee and we are not advised that it is a part of defendant’s religion to exact a fee as well as to pray. But if the- inhibition of the statute tends' to the public welfare and is not obnoxious on other grounds it is not within this provision of the bill of rights. In Bloom v. Richards, 2 Ohio St., 387, 392, Thurman, J., says: “Acts evil in their nature, or dangerous to the public welfare, may be forbidden and punished, though sanctioned by one religion, apd prohibited by another; but this creates no prefer *32 ence whatever, for they would he equally forbidden and punished if all religions permitted them. Thus, no plea of his religion should shield a murderer, ravisher, or bigamist; for community would be at the mercy of superstition, if such crimes as these could be committed with impunity, because sanctioned by some religious delusion. ’ ’
In Reynolds v. United States, 98 U. S., 145, 164, after showing historically how religious freedom came to be guaranteed by amendment to the constitution of the United States, Chief Justice Waite considers what is meant by religious freedom and concludes: “Congress was deprived of all legislative power over mere opinion, but was left free to reach actions which were in violation of social duties or subversive of good order.”
This brings us to the question whether the act, insofar as its application to Christian Science is concerned, is a valid exercise of the police power. The term “police power” it has been said is incapable of exact definition. “It aims directly to secure and promote the public welfare, and it does so by restraint and compulsion.” Section 3, Police Power, Freund.
In Parks v. State, 159 Ind., 211, 220, Gillet, J., gives the following list of subjects that have been dealt with under this power:
“Under this power various burdens are imposed: Criminals.are deprived of their liberty; the implements of crime are destroyed; vice and pauperism are controlled; noxious trades are regulated; nuisances are suppressed; children are required to attend school; the property of infants and persons non compos is placed in the control of others; the con *33 struction of buildings in populous neighborhoods is regulated; provision is made for the greater safety of passengers upon railways and steamboats; employers are required to provide safe places in which the work of their employes is to be performed; the hours of work, in employments deleterious to the health, limited; the employment of children in factories prohibited; pure food laws are enacted; physicians, dentists, and druggists are licensed; and so the list might be almost indefinitely extended by specific ’instances of authorized legislative regulations, enforcing the social compact, for the protection of life, health, morals, property, and the general weal of the community, until we perceive that definition is impossible and that the whole matter of the legislative sovereignty as opposed to individual liberty, must, in the absence of other constitutional restriction, be left, as the federal Supreme Court has declared, to the gradual processes of judicial inclusion and exclusion, as the cases presented for decision require.”
The earlier decisions were to the effect that the only question for judicial consideration was whether a condition for legislation existed, if it did the matter was entirely within the discretion of the legislature. A resort to the polls was the only road to relief from abuse or mistake. (Munn v. Illinois, 94 U. S., 113.) But the later cases are that the power is subject to express state constitutional limitations and to the inhibition of the fourteenth amendment to the constitution of the United States against any state to deprive any person of life, liberty or property without due process of law and to deny to any person within its jurisdiction the equal protection *34 of the laws, and to the implied limitation that every exercise of the power must he reasonable. Police Powers, Freund, sec. 63; Rideout v. Knox, 148 Mass., 368; Lawton v. Steele, 152 U. S., 133; Plessy v. Ferguson, 163 U. S., 537; Wisconsin M. & P. R. R. Co. v. Jacobson, 179 U. S., 287, and Dobbins v. Los Angeles, 195 U. S., 223.
That the practice of medicine may be regulated by legislation has been decided in every court in which the question has arisen. In the leading case, Dent v. West Virginia, 129 U. S., 114, 122, Mr. Justice Fields says:
“The power of the state to.provide for the general welfare of its people authorizes it to prescribe all such regulations as, in its judgment, will secure, or tend to secure them against the consequences of ignorance and incapacity as well as of deception and fraud. As one means to this end it has been the practice of different states, from time immemorial, to exact in many pursuits a certain degree of skill and learning upon which the community may confidently rely, their possession being generally ascer-. tained upon an examination of parties by competent persons, or inferred from a certificate to them in the form of a diploma or license from an institution established for instruction on the subjects, scientific and otherwise, with which such pursuits have to deah The nature and extent of the qualifications required must depend primarily upon the judgment of the state as to their necessity. If they are appropriate to the calling or profession, and attainable by reasonable study or application, no objection to their validity can be raised because of their stringency or difficulty. It is only when they have no relation to *35 such calling or profession, or are unattainable by such reasonable study and application, that they can operate to deprive one of his right to pursue a lawful vocation.
“Few professions require more careful preparation by one who seeks to enter it than that of medicine. It has to deal with all those subtle and mysterious influences upon which health and life depend,, and requires not only a knowledge of the properties1 of vegetable and mineral substances, but of the' human body in all its complicated parts, and their relation to each other, as well as their influence upon the mind. The physician must be able to detect readily the presence of disease and prescribe appropriate remedies for its removal. Every one may have occasion to consult him, but comparatively few can judge of the qualifications of learning and skill which he possesses. Reliance must be placed upon the assurance given by his license, issued by an authority competent to judge in that respect, that he possesses the requisite qualifications. Due consideration, therefore, for the protection of society may well induce the state to exclude from practice those who have not such a license, or who are found upon examination not to be fully qualified.”
And again: “We perceive nothing in the statute which indicates an intention of the legislature to deprive one of any of his rights. No one has a right to practice medicine without having the necessary qualifications of learning and skill; and the statute only requires that whoever assumes, by offering to' the community his services as a physician, that he possesses such learning and skill, shall present evidence of it by a certificate or license from a body *36 designated by tbe state as competent to judge of his qualifications. ’ ’
But it is said tbe offering of prayer to God for tbe recovery of tbe sick is not against public bealtb or public morals or public safety or public welfare. Admitted. But is that a correct statement of tbe case? If tbe defendant prayed for the recovery of Hebl that was tbe treatment be gave him for tbe cure of bis rheumatism and for which Hebl paid him. He was practicing healing or curing disease. To assume that legislation may be directed only against tbe administering of drugs or tbe use of tbe knife is to take a too narrow view. Tbe subject of tbe legislation is not medicine and surgery. It is tbe public bealtb or tbe practice of healing. Tbe state might make it an offense, as has been done in New York (People v. Pierson, 176 N. Y., 201), for any one to omit to furnish medical attendance to those dependent upon him, and at tbe same time leave him at liberty to die in any maimer be may choose. But this is not all. While tbe state may not deem it wise to go to tbe extent of requiring tbe individual to avail himself of tbe services of a physician, yet it may not wish to hasten bis death and so to transfer to itself tbe burden of supporting those dependent upon him by making it possible for him to employ an empiric. Again where there is an infectious or contagious disease tbe public welfare may be vitally affected by a failure promptly to recognize it, and so tbe state is interested in permitting to practice tbe art of healing only those possessing recognized qualifications. So that, regarding disease rather than tbe treatment of it as tbe subject of tbe legislation, it is not necessary that tbe *37 statute be preventive of particular practices, but it may make tbe right to undertake the treatment of disease dependent upon the possession of reasonable qualifications.
It is next contended “that Christian Science is a recognized system or school of healing, and that the statute is unconstitutional, on the ground that it discriminates against Christian Science, or in favor of certain schools of medicine; that different requirements are made of those who use drugs or medicines, of surgeons, and of osteopaths who use no medicines or drugs, but that the Christian Scientist who uses nothing must take the same examination as the regular practitioner, in other words, must understand the use of drugs and medicines, none of which, according to his system, does he ever use. That under the statute the osteopath is given a certificate to practice the healing art according to his system of treatment, without passing an examination before the state board in the subjects of pathology, chemistry and therapeutics, the principles and practice of medicine and surgery. That Christian Science entirely excludes drugs and all material methods of treatment, and relies solely upon prayer as a means for the relief or cure of the sick. Upon what possible theory of justice and equality can the Christian Scientist be required to pass an examination in a half dozen different subjects, which are not required of the osteopath, when these subjects have no relation to the practice of Christian Science and are even further removed from that method of the healing art than they are from the practice of osteopathy? Neither the law nor the rules of the board of medical registration and examination contain any *38 provisions for ascertaining, the attainments of the Christian Scientist who might apply for a certificate to practice his system of healing. The record shows that there is no member of the board qualified to examine a Christian Scientist and no committee or other means for examination has been provided. ”
If we are correct in the conclusion that disease, and not the method of its treatment, is the subject of the legislation, then it is putting the cart before the horse to say that every school of healing must be recognized. That the legislature, in its wisdom, might prescribe a uniform examination, we do not doubt, and that it may recognize one school without recognizing all, is also true, if the recognition be in the exercise of proper classification and for the public welfare, and not with a view to create a monopoly in the schools recognized or a discrimination against other schools. Parles v. The State, 159 Ind., 211; The State ex rel. Kellog v. Currens et al., 111 Wis., 431; Scholle v. State, 90 Md., 729.
The act under consideration in The State, of Ohio v. Gravett, supra, was held void as discriminating against osteopaths because in order to obtain a certificate to practice, limited so that they might not prescribe drugs or perform surgery, they were required to hold diplomas from schools requiring a longer period of study than was required of those for unlimited certificates. The present act, or sections 4403c (94 O. L., 198) and 4403f (95 O. L., 212) make no such discrimination. It provides that no person shall practice medicine and surgery or midwifery without first complying with the requirements of the act. Then it exempts persons entitled *39 to practice at the time the act is to take effect, prescribes what evidence of general learning the applicant shall present as a condition to his being admitted to the examination, and then provides that each applicant shall be examined in certain specified subjects and that he shall be examined in the materia medica and therapeutics and the principles and practice of medicine, of the school of medicine in which he desires to practice, by the member or members of the board representing such school, and if he passes an examination, satisfactory to the board, it shall upon payment of the prescribed fee issue to him a certificate, which when left with the probate judge for record shall be conclusive evidence that its holder is entitled to practice medicine or surgery in this state. It further provides: ‘£ That nothing in this act shall be construed to prohibit services in' a case of emergency and the domestic administration of family remedies; and this act shall not apply to any commissioned medical officer of the United States army, navy or marine hospital service, in the discharge of his professional duties, nor to any legally qualified dentist when engaged exclusively in the practice of dentistry, ’ ’ nor to any physician or surgeon who is a legal practitioner in another state, nor to any Osteopath who shall pass an examination in certain subjects, and then provides for the appointment of a committee to examine applicants to practice osteopathy and prescribes the qualifications for admission. We fail to find anything in the act that discriminates against Christian Science. It does not provide, for a special examination and limited certificate for the Christian Science practitioner, but he may obtain a certificate to practice medicine *40 upon the same conditions as any other person, and there is nothing in the act requiring him to use the knowledge after he acquires it.
In response to an inquiry from the bench as to what, respecting the theory of medicine, a Christian Scientist could be examined, counsel suggested that he might be examined as to his ability to pray. But silent treatment is recommended as likely to be more efficacious.
To admit that a practitioner may determine what treatment he will give for the cure of disease and that the state may examine him only respecting such treatment would be to defeat the purpose of the statute and to make effective legislation of this character impossible.
If the recent statute is too comprehensive the remedy is with the legislature.
The conclusion reached is supported by State of Nebraska v. Buswell, 40 Neb., 158, and the following recent decisions throw more or less light upon such legislation. The People v. Blue Mountain Joe, 129 Ill., 370; Williams v. The People, 121 Ill., 84; The People v. Gordon, 194 Ill., 560; Bragg v. The State, 134 Ala., 165; The State of Iowa v. Bair, 112 Ia., 466; The State of Kansas v. Wilcox, 66 Kan., 711; State of Maine v. Bohemier, 96 Me., 257; People v. Reets, 127 Mich., 87; State v. Biggs, 133 N. C., 729; 98 Am. St., 731, monographic note; State v. Heath, 101 N. W. Rep., 429.

The exceptions are sustained.

Shauck, Price and Spear, JJ., concur.