THE PEOPLE OF THE STATE OF NEW YORK, Petitioner, *v.* AARON DONNER, ZALMAN BLESOFSKY and AARON M. ABER, Respondents.

Domestic Relations Court of the City of New York, Children's Court, School Part, Kings County, September 25, 1950.

*Nicholas Bucci* for Abraham D. Silverman, petitioner.

*Benjamin Weberman* for respondents.

DELANY, J. This prosecution for violation of the Compulsory Education Law (Education Law, § 3212) presents a grave constitutional question. The case was presented to the court for determination upon an agreed statement of facts.

The Domestic Relations Court of the City of New York is a statutory court of enumerated powers; see *Gardner* v. *Domestic Relations Court of City of New York, Children's Court Division* (184 Misc. 44). Section 3227 of the Education Law expressly confers upon this court exclusive jurisdiction to entertain a prosecution for violation of section 3212 of the Education Law.

According to the agreed statement of facts, respondents are the fathers of children of school age who do not now attend any public, private or parochial school in which secular subjects are taught; instead they attend a small religious school maintained by persons of the Jewish faith in the borough of Brooklyn, city of New York, which is not registered with nor recognized by the Jewish Education Committee of New York which supervises secular instruction in Hebrew parochial schools. It functions as an entirely independent organization.

The only instruction received by the children who attend this school is in the Bible, the Talmud and elementary Jewish law.

Time is allotted to them for supervised play. They receive some physical training. Attendance is from 9:30 A.M. to about 4:00 P.M. at least five days a week. No record of attendance is kept. The sole instructor admittedly does not possess the minimum qualifications of a teacher for secular instruction required by the board of education of the city of New York.

The children do not receive any formal or systematic instruction in the ten common branches and other courses of study required by section 3204 of the Education Law. English is not the language of instruction. Such textbooks as are used in the school are not written in English. The children receive a certain amount of instruction (in the Hebrew language) informally, in arithmetic, geography, civics, hygiene and physical education, but only as an incident to their instruction in the Bible, the Talmud and the Jewish law. Such information as they may acquire in the remaining common branch subjects, namely, reading, spelling, writing English language and United States history, they have obtained through other, informal contacts outside the school.

It is conceded by the parties hereto for the purpose of this case that in the course of their instruction, these children are taught and trained in the different concepts of moral and religious behavior and respect for and loyalty to the laws of our country generally and the rights of others, suited in content, method and objective to their years, and that, particularly as a result of the mental discipline derived from the nature of their instruction in this religious school, these children are mentally alert.

It is further conceded by the parties hereto that it is the religious belief of the parents of these children that all systematic, secular education is prohibited as a matter of Jewish law. They believe that where the provisions of the Compulsory Education Law of the State of New York are in conflict with these provisions of the Jewish law, the latter must prevail.

The court can take judicial notice that practically all Jewish children of school age in the United States receive secular instruction in the public schools, except some who attend Hebrew parochial schools in which they receive both secular and religious instruction. It seems obvious that respondents' interpretation of the fundamental Jewish law is not in accordance with the normal interpretation of almost all Americans of the Hebrew faith. The court does not question the *bona fides* of respondents' belief in this case in their interpretation of the

Jewish law of their particular sect, and therefore cannot pass upon the validity of that interpretation. (*United States v. Ballard*, 322 U. S. 78.)

*People* v. *Turner* (277 App. Div. 317) recently decided by the Appellate Division, Fourth Department, is clearly distinguishable from the case at bar. The court there reversed a conviction for violation of subdivision 2 of section 3212 of the Education Law, on the ground that the lower court had erroneously excluded proffered evidence relating to the character and type of instruction given at home to respondents' children by their mother. The trial court had ruled that since the respondent mother did not have a certificate to teach, " the question of the equivalency " of the instruction given by her " to the instruction given to minors of like age and attainments at the public schools " was not in issue. The Appellate Division ruled that section 3204 of article 65 of the Education Law does not require certification of a parent by the Commissioner of Education before she may teach her children at home, and that the exclusion of such evidence by the trial court constituted reversible error. In the instant case it is conceded in the stipulated statement of facts that the instruction given to respondents' children is *not* " substantially equivalent to the instruction given to minors of like age and attainments at the public schools ". Indeed, the language of instruction is not even English, and the certification or noncertification by the board of education of the sole instructor in the school is accordingly irrelevant.

In the case at bar respondents contend, and it cannot fairly be contested, that in view of their deep religious convictions, enforcement of the Compulsory Education Law against them infringes upon their religious liberty. Whether this infringement violates respondents' constitutional rights is the underlying question involved in this case.

Religious liberty and freedom of worship are protected by the Constitutions of both the State of New York and the United States. Section 3 of article I of the New York State Constitution provides that, " The free exercise and enjoyment of religious profession and worship, without discrimination or preference, shall forever be allowed in this state to all mankind ". The First Amendment of the Federal Constitution prohibits any " law respecting an establishment of religion, or prohibiting the free exercise thereof ". While this amendment refers specifically only to Congress, it is now well settled that the prohibitions imposed upon Congress by the First Amend-

ment have been incorporated into the Fourteenth Amendment as prohibitions against the States. (*Cantwell* v. *Connecticut,* 310 U. S. 296, 303; *Murdock* v. *Pennsylvania,* 319 U. S. 105, 108; *Jamison* v. *Texas,* 318 U. S. 413; *West Virginia State Bd. of Educ.* v. *Barnette,* 319 U. S. 624; *Marsh* v. *Alabama,* 326 U. S. 501.)

*Pierce* v. *Society of Sisters* (268 U. S. 510) held unconstitutional a statute that sought to prohibit the operation of parochial or private schools. The *Pierce* case did not hold that the State could not compel children to receive secular education. Rather did it hold that the State could not prescribe the place where, or the auspices under which, secular education was to be obtained. The court expressly stated: " No question is raised concerning the power of the State reasonably to regulate all schools, to inspect, supervise and examine them, their teachers and pupils; to require that all children of proper age attend some school, that teachers shall be of good moral character and patriotic disposition, that certain studies plainly essential to good citizenship must be taught, and that nothing be taught which is manifestly inimical to the public welfare." (P. 534.)

That the *Pierce* case (*supra*) did not hold that sectarian education could constitutionally be substituted for secular education, is unequivocally clear from the Supreme Court's statement in *Everson* v. *Board of Educ. of Ewing Township* (330 U. S. 1, 18): " This Court has said that parents may, in the discharge of their duty under state compulsory education laws, send their children to a religious rather than a public school if the school meets the *secular* educational requirements which the state has power to impose. See *Pierce* v. *Society of Sisters,* 268 U. S. 510." (Emphasis added.)

In *Meyer* v. *Nebraska* (262 U. S. 390) the Supreme Court invalidated a State law prohibiting the teaching in any private, denominational, parochial or public school of any modern language other than English to any child who had not passed the eighth grade. The court held that the statute interfered with the constitutional right of the parent " to bring up children, [and] to worship God according to the dictates of his own conscience ". (P. 399.) The court, however, expressly stated that " the power of the State to compel attendance at some school and to make reasonable regulations of the schools, including a requirement that they shall give instructions in English, is not questioned." (P. 402.)

Public education laws are the outgrowth of social legislation designed to give equality of opportunity to all children in a society dedicated to the democratic ideal. Without equality of opportunity in education there is no equality among the children of our democratic society. This has recently been made clear by the Supreme Court in *Sweat* v. *Painter* (339 U. S. 629) and *McLaurin* v. *Oklahoma State Regents* (339 U. S. 637). Moreover, our State and our society has an interest in seeing to it that every child receives a basic secular education since the kind of education our children receive has substantial bearing upon the kind of citizens they will become when they grow into maturity. The kind and quality of education our children receive have like bearing upon whether they will in later life be able to take their rightful place in civil society or whether they may, by reason of a lack of equal educational opportunities, become frustrated delinquents or frustrated adults who continually run afoul of our criminal statutes. Both Federal and State aid to public education is designed in part to insure equality of education between the poorer and wealthier counties within the State and the poorer and wealthier States within the United States. Since equality of education has a direct bearing upon the economic resourcefulness of our country in times of peace and directly affects the civil and military manpower resources of our country in times of war, every citizen has an interest in whether all of our children receive a basic secular education.

Education has long been recognized as " one of the purposes for which * * * the police power may be exercised." (*Interstate Cons. St. Ry. Co.* v. *Massachusetts,* 207 U. S. 79, 87.) The American people have always regarded education and acquisition of knowledge as matters of supreme importance which should be diligently promoted. (*Meyer* v. *Nebraska,* 262 U. S. 390, 400, *supra.*) This recognition of the importance of secular education has become a fundamental part of our system of society. It has been recognized in the power of the State to tax all citizens, including the unmarried and the childless, for the maintenance of a universal public educational system (*Everson* v. *Board of Educ. of Ewing Township,* 330 U. S. 1, 7, *supra; Stuart* v. *School Dist. No. 1,* 30 Mich. 69).

The reports are replete with cases which indicate the vital stake which the State has in the secular education of its citizenry, and its power to enforce laws reasonably required to compel compliance.

The finding of fact that there has been an infringement of the religious liberty of respondents, does not necessarily require a determination by the court that their constitutional rights have been violated. The constitutional guaranty of religious liberty " embraces two concepts — freedom to believe and freedom to act. The first is absolute but, in the nature of things, the second cannot be. Conduct remains subject to regulation for the protection of society." (*Cantwell* v. *Connecticut, supra,* pp. 303–304.) Respondents' failure to act — i.e., failure to obtain public or private secular education for their children as prescribed in section 3204 of the Education Law of the State of New York constitutes conduct which is subject to regulation for the protection of society. (*People* v. *Pierson,* 176 N. Y. 201.)

There is no doubt that in " adjudicating the clash of freedoms which the Bill of Rights was designed to resolve — the freedom of the community to regulate its life and the freedom of the individual to exercise his religion " (Mr. Justice FRANKFURTER concurring in *Marsh* v. *Alabama, supra,* p. 511), the court must accord due recognition to " the preferred place given in our scheme to the great, the indispensable democratic freedoms secured by the First Amendment." (*Thomas* v. *Collins,* 323 U. S. 516, 530.) These liberties possess " a sanctity and a sanction not permitting dubious intrusions." (*Thomas* v. *Collins, supra,* p. 530.)

The United States Supreme Court has been diligent in protecting the right to religious liberty secured by the First Amendment. Some interests which a State would seem to have a right to protect have been held subordinate. Governmental power to prevent fraud, preserve cleanliness of streets, regulate highway traffic, raise revenue and require overt manifestations of loyalty, have in many instances been held subject to restrictions when their exercise interfered with the religious liberty of the people. (*United States* v. *Ballard, supra; Schneider* v. *New Jersey,* 308 U. S. 147; *Martin* v. *Struthers,* 319 U. S. 141; *Cantwell* v. *Connecticut, supra; Murdock* v. *Pennsylvania, supra; Follett* v. *Town of McCormick,* 321 U. S. 573; *West Virginia State Bd. of Educ.* v. *Barnette, supra.*)

On the other hand, the courts have upheld legislative interference with religious liberty where such interference has been found clearly necessary for the protection of society. Since Western society is based upon the monogamous family, the interests of the State in the protection of our total society from polygamy was held superior to the religious conviction of

Mormons in plural marriages. (*Reynolds* v. *United States*, 98 U. S. 145; *Davis* v. *Beason*, 133 U. S. 333.) The courts have uniformly held that the duty required of every citizen to " support and defend government against all enemies " takes precedence over certain religious convictions against armed warfare. (*Hamilton* v. *Regents of Univ. of California*, 293 U. S. 245, 262–263.) The State's obligation to preserve peace and orderliness is superior to an individual's religiously motivated conduct which disturbs the peace of the community, (*Chaplinsky* v. *New Hampshire*, 315 U. S. 568), and the State's interest in protecting the community from communicable diseases takes precedence over the individual's religious opposition to vaccination. (*Jacobson* v. *Massachusetts*, 197 U. S. 11.) Like illustrations need not be multiplied to show that respondents' opposition to secular education on religious grounds, does not necessarily exempt them from the obligations imposed by our compulsory education laws requiring compliance therewith by respondents.

These respondent parents claim that their religious beliefs prevent them from complying with the secular compulsory education law, and that whenever the law of their religion is in conflict with the secular law, the religious law must prevail. The soundness of respondents' contention that they are exempt from complying with section 3212 of article 65 of the Education Law of the State of New York, depends upon whether the courts have already held, and should again reiterate, that whenever the interests of the State and of our total society, are in conflict with the particular beliefs or dogmas of any religion, the secular law must take precedence over the religious law, where the interests of a democratic society clearly require compliance with the secular law.

A restriction of religious liberty, like other liberties guaranteed by the Constitution, has been held by the courts to be justified if it is clearly and immediately necessary to protect our total society against the unrestricted exercise of a religious conviction of a particular sect of a religion. (*Reynolds* v. *United States, supra; Davis* v. *Beason, supra; Chaplinsky* v. *New Hampshire, supra; Prince* v. *Massachusetts*, 321 U. S. 158; *Thomas* v. *Collins, supra.*) In all cases where an individual seeks to invoke the protection of the constitutional safeguards of religious liberties the court is faced with the responsibility of weighing the interest of our total society in compelling compliance, as against the interest of our total society in permitting noncompliance.

In this case, therefore, the issue is whether it is more important to our total society, that all children within the realm of our democratic society shall receive a basic secular education in the English language as prescribed in section 3204 of the Education Law, than that parents whose religious convictions preclude compliance with our secular education laws, shall be permitted to rear their children exclusively in conformance with their religious conviction. If the answer were in the negative, it might leave the door open to all sorts of abuses against society in the name of religion.

Under our system of government, and as a result of the interpretations placed upon the cherished amendments designed to safeguard religious liberty, any individual may at any time establish and incorporate a new religion, as different from existing religions as despotism is from democracy. No individual or agency of the government — not even the courts, can question the right of any citizen to sponsor or establish a new religion. Nor can the validity of the tenets of such a new religion be questioned — no matter whether the founder thereof be native or foreign born — whether he be educated or illiterate — whether he may act to some like a saint or to others like a sinner. On the other hand, a negative determination of the basic question propounded in the preceding paragraph would permit an illiterate farmer — who became tired of plowing in the cotton fields, to decide that such work was too hard, and the pay too small — to see, or to think he saw, or to say that he had seen a vision from heaven, directing that he as God's servant should stop plowing, and should go forth, and henceforth preach the Gospel of the Lord; which according to his interpretation of his " vision ", would lead him to teach his religious followers to prevent the vaccination of their children, on religious grounds; to prevent attendance by a physician when the infant children of his flock were ill, on religious grounds, to oppose paying taxes to a secular body, on religious grounds, etc. Such an interpretation of religious liberty would, in effect, place the clerical dogma of any religion, or any sect which chose to call itself a religion, above all secular law. It would mean that we had abandoned the long established tenets of our Founding Fathers, of the principle of separation of church and state. It would mean that all religions now in existence and any new sect which called itself a religion, could exert influence detrimental to the welfare of society whenever the religious dogma of such religion or sect required its followers to obey the clerical law and disobey the secular law.

The Constitution does not require such sacrifice of the common welfare, to protect an individual's religious liberty.

It seems clear therefore that the religious convictions of respondents herein must yield to the total public interest. Compulsory education laws constitute but one of many statutes of a government, dedicated to the democratic ideal, which are universally enacted for the benefit of all of the children within the realm of government. Child labor laws and laws making it criminal to abandon or neglect children, are similar instances of governmental intervention for the protection of children. Religious convictions of parents cannot interfere with the responsibility of the State to protect the welfare of children. (*People* v. *Pierson, supra; Prince* v. *Massachusetts, supra.*)

In *People* v. *Pierson* (176 N. Y. 201, *supra*) our Court of Appeals held that a parent who neglected to call a physician for his ill child because " he believed in Divine healing which could be accomplished by prayer " and " that religion was a cure of disease " (p. 204) could be convicted for violation of a statute requiring parents to furnish medical attendance to a minor. The court said (p. 211): " The peace and safety of the state involves the protection of the lives and health of its children as well as the obedience to its laws. Full and free enjoyment of religious professions and worship is guaranteed, but acts which are not worship are not. A person cannot, under the guise of religious belief, practice polygamy and still be protected from our statutes constituting the crime of bigamy. He cannot, under the belief or profession of belief that he should be relieved from the care of children, be excused from punishment for slaying those who have been born to him. Children when born into the world are utterly helpless, having neither the power to care for, protect or maintain themselves. They are exposed to all the ills to which flesh is heir, and require careful nursing, and at times, when danger is present, the help of an experienced physician."

In *Prince* v. *Massachusetts* (321 U. S. 158, *supra*) the United States Supreme Court held that a statute forbidding children to sell magazines in public places and penalizing the parents of children who permit them to sell magazines in public places is not an unconstitutional abridgement of religious liberty when applied to a member of a religious sect who furnished religious periodicals to a child and permitted her to sell them on the streets. In language which is particularly appropriate here, the court stated (pp. 166–167, 168–169): " But the family itself

is not beyond regulation in the public interest, as against a claim of religious liberty. *Reynolds* v. *United States,* 98 U. S. 145 \* \* \* And neither rights of religion nor rights of parenthood are beyond limitation. Acting to guard the general interest in youth's well being, the state as *parens patriae may restrict the parent's control by requiring school attendance,* regulating or prohibiting the child's labor and in many other ways. *Its authority is not nullified merely because the parent grounds his claim to control the child's course of conduct on religion or conscience.* Thus, he cannot claim freedom from compulsory vaccination for the child more than for himself on religious grounds. The right to practice religion freely does not include liberty to expose the community or the child to communicable disease or the latter to ill health or death. *People* v. *Pierson,* 176 N. Y. 201 \* \* \*. The catalogue need not be lengthened. It is sufficient to show what indeed appellant hardly disputes, that the state has a wide range of power for limiting parental freedom and authority in things affecting the child's welfare; and that this includes to some extent, matters of conscience and religious conviction. \* \* \* The state's authority over children's activities is broader than over like actions of adults \* \* \* A democratic society rests, for its continuance, upon the healthy, well-rounded growth of young people into full maturity as citizens, with all that implies. It may secure this against impeding restraints and dangers, within a broad range of selection \* \* \* *It is too late now to doubt that legislation appropriately designed to reach such evils is within the state's police power, whether against the parent's claim to control of the child or one that religious scruples dictate contrary action.''* (Emphasis added.)

Recognizing that the religious convictions of some parents require them to advise, and where practicable, to compel their children to receive their secular education under the same auspices as their religious education, the Supreme Court in the *Pierce* case (*supra*) accorded constitutional protection to this conviction. It did not, however, hold that sectarian education could be substituted in whole or in part for statutorily required secular education. Indeed, the same constitutional provision which recognizes this right, imposes upon the States the obligation to keep church and State separate, and prohibits them from accepting sectarian education as a substitute, in whole or in part, for such statutorily required secular education. (*Illinois ex rel. McCollum* v. *Board of Education,* 333 U. S. 203; Pfeffer,

Religion, Education and the Constitution, 8 Law. Guild Rev. 387.)

Since this court finds, for the foregoing reasons that the constitutional rights of respondents herein have not been violated, it follows that they and each of them are guilty of having violated section 3212 of the public Education Law. Respondents and each of them are directed to appear in Part II of the Brooklyn Children's Court on September 28, 1950, at 10:00 o'clock in the forenoon for sentence in compliance with section 3228 of the Education Law.

Copies of this opinion are to be mailed forthwith by the clerk of this court to each respondent herein and to counsel for each of the parties thereto.